KATIE TOWNSEND (SBN 254321)
ktownsend@rcfp.org
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1250
Washington, D.C. 20005
Telephone:  202.795.9300
Facsimile:  202.795.9310

*Counsel of Record for Amici Curiae*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **FREEDOM OF THE PRESS FOUNDATION**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF JUSTICE**, <br><br> Defendant. | CASE NO.  15-cv-03503-HSG <br><br> **REQUEST OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 37 MEDIA ORGANIZATIONS FOR LEAVE TO FILE BRIEF *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF *AMICUS CURIAE*** <br><br> Date:  August 18, 2016 <br> Time:  2:00 p.m. <br> Courtroom 10, 19th Floor <br><br> Hon. Haywood S. Gilliam Jr. |

1

## REQUEST FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF

2

The Reporters Committee for Freedom of the Press ("Reporters Committee"), ALM Media,

3

LLC, American Society of News Editors, The Associated Press, Association of Alternative

4

Newsmedia, Association of American Publishers, Inc., BuzzFeed, Cable News Network, Inc.,

5

California Newspaper Publishers Association, Chicago Tribune Company, LLC, Committee to

6

Protect Journalists, The Daily Beast Company LLC, The E.W. Scripps Company, First Amendment

7

Coalition, First Look Media Works, Inc., Gannett Co., Inc., Gawker Media LLC, International

8

Documentary Assn., Investigative Reporters and Editors, Investigative Reporting Workshop at

9

American University, Los Angeles Times Communications LLC, The McClatchy Company, The

10

Media Consortium, MPA – The Association of Magazine Media, National Press Photographers

11

Association, National Public Radio, Inc., The New York Times Company, The News Guild - CWA,

12

Newspaper Association of America, North Jersey Media Group Inc., Online News Association,

13

ProPublica, Radio Television Digital News Association, Reporters Without Borders, Society of

14

Professional Journalists, Student Press Law Center, TEGNA Inc., and the Tully Center for Free

15

Speech (collectively, "*amici*") respectfully request permission to file the attached *amicus curiae*

16

brief in support of the Freedom of the Press Foundation's ("FPF") Opposition to Defendants'

17

Motion for Summary Judgment and Cross-Motion for Summary Judgment in this action.  The brief

18

of the Reporters Committee and the media coalition will assist the Court in providing background

19

on the U.S. Department of Justice's new policies regarding the use of legal process to obtain

20

information from, or records of, the news media.  *See* 28 C.F.R. § 50.10.

21

FPF has consented to the filing of the attached *amicus* brief.  The Government takes no

22

position on the Reporters Committee's request for leave to file the attached *amicus* brief.

23

24

25

26

27

28

1

## IDENTITY OF AMICI

2

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit

3

association of reporters and editors that works to defend the First Amendment rights and freedom of

4

information interests of the news media. The Reporters Committee has provided assistance and

5

research in First Amendment and Freedom of Information Act litigation since 1970.

6

ALM Media, LLC publishes over 30 national and regional magazines and newspapers,

7

8

including *The American Lawyer*, *The National Law Journal*, *New York Law Journal* and*Corporate*

9

*Counsel*, as well as the website Law.com. Many of ALM's publications have long histories

10

reporting on legal issues and serving their local legal communities. ALM's *The Recorder*, for

11

example, has been published in northern California since 1877; *New York Law Journal* was begun a

12

few years later, in 1888. ALM's publications have won numerous awards for their coverage of

13

critical national and local legal stories, including many stories that have been later picked up by

14

other national media.

15

With some 500 members, American Society of News Editors ("ASNE") is an organization

16

17

that includes directing editors of daily newspapers throughout the Americas. ASNE changed its

18

name in April 2009 to American Society of News Editors and approved broadening its membership

19

to editors of online news providers and academic leaders. Founded in 1922 as American Society of

20

Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on

21

improving freedom of information, diversity, readership and the credibility of newspapers.

22

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit

23

24

Corporation Law of New York, and owned by its 1,500 U.S. newspaper members. The AP's

25

members and subscribers include the nation's newspapers, magazines, broadcasters, cable news

26

services and Internet content providers. The AP operates from 300 locations in more than 100

27

countries. On any given day, AP's content can reach more than half of the world's population.

28

*Freedom of the Press Foundation v. United States Dep't of Justice*, Case No. 15-cv-03503-HSG                                    iii
Request for Leave to File Brief *Amicus Curiae*

Association of Alternative Newsmedia ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

The Association of American Publishers, Inc. ("AAP") is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and nonprofit publishers, university presses and scholarly societies. AAP members publish hardcover and paperback books in every field, educational materials for the elementary, secondary, postsecondary and professional markets, scholarly journals, computer software and electronic products and services. The Association represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

BuzzFeed is a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

Cable News Network, Inc. ("CNN"), a division of Turner Broadcasting System, Inc., a Time Warner Company, is the most trusted source for news and information. Its reach extends to the following: nine cable and satellite television networks; one private place-based network; two radio networks; wireless devices around the world; CNN Digital Network, the No. 1 network of news websites in the United States; CNN Newsource, the world's most extensively syndicated news service; and strategic international partnerships within both television and the digital media.

The California Newspaper Publishers Association ("CNPA") is a nonprofit trade association representing the interests of nearly 850 daily, weekly and student newspapers throughout California.

*Freedom of the Press Foundation v. United States Dep't of Justice*, Case No. 15-cv-03503-HSG
Request for Leave to File Brief *Amicus Curiae*

iv

For over 130 years, CNPA has worked to protect and enhance the freedom of speech guaranteed to all citizens and to the press by the First Amendment of the United States Constitution and Article 1, Section 2 of the California Constitution. CNPA has dedicated its efforts to protect the free flow of information concerning government institutions in order for newspapers to fulfill their constitutional role in our democratic society and to advance the interest of all Californians in the transparency of government operations.

The Daily Beast was founded in 2008 as the vision of Tina Brown and IAC Chairman Barry Diller. Curated to avoid information overload, the site is dedicated to breaking news and sharp commentary. John Avlon serves as editor-in-chief of the site which regularly attracts over 20 million unique online visitors a month and is the winner of two consecutive Webby awards for 'best news' site.

The E.W. Scripps Company serves audiences and businesses through television, radio and digital media brands, with 33 television stations in 24 markets. Scripps also owns 34 radio stations in eight markets, as well as local and national digital journalism and information businesses, including mobile video news service Newsy and weather app developer WeatherSphere. Scripps owns and operates an award-winning investigative reporting newsroom in Washington, D.C. and serves as the long-time steward of the nation's largest, most successful and longest-running educational program, the Scripps National Spelling Bee.

First Amendment Coalition is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

First Look Media Works, Inc. is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

Gannett Co., Inc. is an international news and information company that publishes 108 daily newspapers in the United States and Guam, including USA TODAY. Each weekday, Gannett's newspapers are distributed to an audience of more than 8 million readers and the digital and mobile products associated with the company's publications serve online content to more than 100 million unique visitors each month.

Gawker Media LLC is the publisher of some of the web's best-loved brands and communities, including the eponymous Gawker, the gadget sensation Gizmodo, and the popular sports site Deadspin. Founded in 2002, Gawker's sites reach over 100 million readers around the world each month.

The International Documentary Association (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

Investigative Reporters and Editors, Inc. is a grassroots nonprofit organization dedicated to improving the quality of investigative reporting. IRE was formed in 1975 to create a forum in which journalists throughout the world could help each other by sharing story ideas, newsgathering techniques and news sources.

The Investigative Reporting Workshop, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

Los Angeles Times Communications LLC and Chicago Tribune Company, LLC are two of the largest daily newspapers in the United States.  Their popular news and information websites,

*Freedom of the Press Foundation v. United States Dep't of Justice*, Case No. 15-cv-03503-HSG
Request for Leave to File Brief *Amicus Curiae*

vi

www.latimes.com and www.chicagotribune.com, attract national audiences.  Los Angeles Times Communications LLC and Chicago Tribune Company, LLC are subsidiaries of Tribune Publishing Company.

The McClatchy Company is a 21st century news and information leader, publisher of iconic brands such as the Miami Herald, The Kansas City Star, The Sacramento Bee, The Charlotte Observer, The (Raleigh) News and Observer, and the (Fort Worth) Star-Telegram. McClatchy operates media companies in 28 U.S. markets in 14 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats. McClatchy is headquartered in Sacramento, Calif., and listed on the New York Stock Exchange under the symbol MNI.

The Media Consortium is a network of the country's leading, progressive, independent media outlets. Our mission is to amplify independent media's voice, increase our collective clout, leverage our current audience and reach new ones.

MPA – The Association of Magazine Media, ("MPA") is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well

*Freedom of the Press Foundation v. United States Dep't of Justice*, Case No. 15-cv-03503-HSG
Request for Leave to File Brief *Amicus Curiae*

vii

as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

National Public Radio, Inc. (NPR) is an award-winning producer and distributor of noncommercial news, information, and cultural programming. A privately supported, not-for-profit membership organization, NPR serves an audience of more than 26 million listeners each week via more than 1000 noncommercial, independently operated radio stations, licensed to more than 260 NPR Members and numerous other NPR-affiliated entities. In addition, NPR is reaching an expanding audience via its digital properties, including NPR.org and NPR's applications, which see more than 30 million unique visitors each month. National Public Radio, Inc. has no parent company and issues no stock.

The New York Times Company is the publisher of *The New York Times* and *The International Times*, and operates the news website nytimes.com.

The News Guild – CWA is a labor organization representing more than 30,000 employees of newspapers, newsmagazines, news services and related media enterprises. Guild representation comprises, in the main, the advertising, business, circulation, editorial, maintenance and related departments of these media outlets. The News Guild is a sector of the Communications Workers of America. CWA is America's largest communications and media union, representing over 700,000 men and women in both private and public sectors.

Newspaper Association of America ("NAA") is a nonprofit organization representing the interests of more than 2,000 newspapers in the United States and Canada. NAA members account for nearly 90% of the daily newspaper circulation in the United States and a wide range of non-daily newspapers. The Association focuses on the major issues that affect today's newspaper industry, including protecting the ability of the media to provide the public with news and information on matters of public concern.

*Freedom of the Press Foundation v. United States Dep't of Justice*, Case No. 15-cv-03503-HSG
Request for Leave to File Brief *Amicus Curiae*

viii

North Jersey Media Group Inc. ("NJMG") is an independent, family-owned printing and publishing company, parent of two daily newspapers serving the residents of northern New Jersey: *The Record* (Bergen County), the state's second-largest newspaper, and the *Herald News* (Passaic County). NJMG also publishes more than 40 community newspapers serving towns across five counties and a family of glossy magazines, including (201) Magazine, Bergen County's premiere magazine. All of the newspapers contribute breaking news, features, columns and local information to NorthJersey.com. The company also owns and publishes Bergen.com showcasing the people, places and events of Bergen County.

Online News Association ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

ProPublica is an independent, nonprofit newsroom that produces investigative journalism in the public interest. In 2010, it was the first online news organization to win a Pulitzer Prize. In 2011, ProPublica won its second Pulitzer, the first ever awarded to a body of work that did not appear in print. This year, ProPublica was awarded its third Pulitzer. In 2014, ProPublica won a MacArthur Award for Creative and Effective Leadership. ProPublica is supported primarily by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

Reporters Without Borders has been fighting censorship and supporting and protecting journalists since 1985. Activities are carried out on five continents through its network of over 150 correspondents, its national sections, and its close collaboration with local and regional press freedom groups. Reporters Without Borders currently has 10 offices and sections worldwide.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

Student Press Law Center ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States. SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

TEGNA Inc. owns or services (through shared service agreements or other similar agreements) 46 television stations in 38 markets.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

## INTEREST OF AMICI

As members and representatives of the news media, *amici* have a strong interest in understanding the rules and procedures that the Federal Bureau of Investigation ("FBI") observes when it uses NSLs, exigent letters, and other forms of legal process to obtain reporters' communications records.  The perspective and arguments of *amici* can assist the Court in ruling on the cross-motions for summary judgment by providing additional information and analysis regarding the need for the news media and the public to have access to the FBI's rules regarding these processes.  This issue, which is not fully addressed in the parties' briefs, is of critical importance and will inform this Court's decision on the Government's Motion.

For these reasons, *amici* respectfully request leave to file the attached brief as *amicus curiae* in support of Plaintiff's motion for summary judgment.

Dated: June 10, 2016                                    Respectfully submitted,


                                                        */s/Katie Townsend*
                                                        Katie Townsend
                                                        *Counsel of Record for Amici Curiae*
                                                        THE REPORTERS COMMITTEE FOR
                                                        FREEDOM OF THE PRESS

1  KATIE TOWNSEND (SBN 254321)
   ktownsend@rcfp.org
2  THE REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
3  1156 15th Street NW, Suite 1250
   Washington, D.C. 20005
4  Telephone:  202.795.9300
   Facsimile:  202.795.9310
5
6  *Counsel of Record for Amici Curiae*

7

8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12

13 **FREEDOM OF THE PRESS**        CASE NO.  15-cv-03503-HSG
   **FOUNDATION**,
                                  **BRIEF *AMICUS CURIAE* OF THE**
14              Plaintiff,         **REPORTERS COMMITTEE FOR**
                                  **FREEDOM OF THE PRESS AND 37**
15         v.                      **MEDIA ORGANIZATIONS IN SUPPORT**
                                  **OF PLAINTIFF'S OPPOSITION TO**
16 **UNITED STATES DEPARTMENT OF** **DEFENDANT'S MOTION FOR**
   **JUSTICE**,                    **SUMMARY JUDGMENT**
17
18              Defendant.         Date:  August 18, 2016
                                  Time:  2:00 p.m.
19                                Courtroom 10, 19th Floor

20                                Hon. Haywood S. Gilliam Jr.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................................i

TABLE OF AUTHORITIES .........................................................................................i

INTRODUCTION ......................................................................................................1

INTEREST OF AMICI CURIAE ..................................................................................3

ARGUMENT .............................................................................................................3

    I.     The manner in which the FBI uses legal process to obtain journalists' toll billing records is of substantial interest and importance to the media and the public. ....................................3

    II.    The FBI's use of NSLs and exigent letters to obtain journalists' toll billing records is a matter of particular public interest and concern. ...............................................8

        A.   NSLs, and the secrecy surrounding them, imperil the confidential relationship between reporters and sources...............................................................................8

        B.   The FBI has previously disregarded regulatory protections for the press by using informal requests to obtain news media records.....................................................13

CONCLUSION..........................................................................................................15

APPENDIX A ..........................................................................................................16

**CORPORATE DISCLOSURE STATEMENT**

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

ALM Media, LLC is privately owned, and no publicly held corporation owns 10% or more of its stock.

American Society of News Editors is a private, non-stock corporation that has no parent.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

The Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

BuzzFeed Inc. is a privately owned company, with no public companies that own 10% or more of its stock.

Cable News Network, Inc. is a wholly owned subsidiary of Turner Broadcasting System, Inc., which itself is a wholly owned subsidiary of Time Warner Inc., a publicly traded corporation.

California Newspaper Publishers Association is a mutual benefit corporation organized under state law for the purpose of promoting and preserving the newspaper industry in California.

The Daily Beast Company LLC is owned by IAC/InterActiveCorp, a publicly traded company, and the Sidney Harman Trust, with IAC holding a controlling interest.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

First Look Media Works, Inc. is a non-profit non-stock corporation organized under the laws of Delaware. No publicly-held corporation holds an interest of 10% or more in First Look Media Works, Inc.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company holds 10% or more of its stock.

Gawker Media LLC is privately held and wholly owned by privately held Gawker Media Group, Inc. No publicly held corporation holds an interest of 10% or more in Gawker Media LLC.

The International Documentary Association is an non-for-profit organization with no parent corporation and no stock.

Investigative Reporters & Editors (IRE) is an independent, 501c3 nonprofit organization that provides resources and training for journalists. IRE has no parent company and does not sell stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization affiliated with the American University School of Communication in Washington. It issues no stock.

Los Angeles Times Communications LLC and Chicago Tribune Company, LLC are subsidiaries of Tribune Publishing Company.  Tribune Publishing Company is publicly held.  Merrick Media, LLC, Nant Capital, LLC, Oaktree Capital Management, L.P., and Primecap Management Company each own 10 percent or more of Tribune Publishing Company's stock.

The McClatchy Company is publicly traded on the New York Stock Exchange under the ticker symbol MNI. Contrarius Investment Management Limited owns 10% or more of the common stock of The McClatchy Company.

The Media Consortium has no parent corporation and no stock.

MPA – The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

The News Guild – CWA is an unincorporated association. It has no parent and issues no stock.

Newspaper Association of America is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

North Jersey Media Group Inc. is a privately held company owned solely by Macromedia Incorporated, also a privately held company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Reporters Without Borders is a nonprofit association with no parent corporation.

Society of Professional Journalists is a non-stock corporation with no parent company.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

TEGNA Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in TEGNA, Inc.

1

The Tully Center for Free Speech is a subsidiary of Syracuse University.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Cases**

*Application for Search Warrant for E-mail Account [redacted]@gmail.com*, No. 1:10-mj-00291-AK (D.D.C., Affidavit in support of application for search warrant, unsealed Nov. 7, 2011)........ 5

*In re NSL*, No. 2:13-cv-1048-RAJ (W.D. Wash. May 21, 2014) .............................................. 12

*In re NSLs*, No. 11-cv-02173-SI (N.D. Cal. Mar. 29, 2016)............................................... 9, 12

*Mayer Brown LLP v. I.R.S.*, 562 F.3d 1190 (D.C. Cir. 2009) ............................................. 8

*Merrill v. Lynch*, No. 14-CV-9763 (VM), 2015 WL 9450650 (S.D.N.Y. Aug. 28, 2015)............... 12

**Statutes**

18 U.S.C. § 2703(d) ............................................................................................. 6

18 U.S.C. § 2709................................................................................................ 9, 11

5 U.S.C. § 552 ............................................................................................. 1, 2, 8

**Other Authorities**

Alison Leigh Cowan, *Four Librarians Finally Break Silence in Records Case*,
N.Y. Times (May 31, 2006)................................................................................ 12

Charlie Savage, *Holder Tightens Rules on Getting Reporters' Data*,
N.Y. Times (July 12, 2012) ............................................................................... 7

Chris Madsen, *Yahoo Announces Public Disclosure of National Security Letters*,
Yahoo! Global Public Policy (Jun. 1, 2016) ........................................................... 12

Dep't of Justice, Office of the Inspector General, *A Review of the FBI's Use of NSLs: Assessment of Corrective Actions and Examination of NSL Usage in 2006* (Mar. 2008) ("NSL Report II")...... 11

Dep't of Justice, Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records* (Jan. 2010)............ 14

Dep't of Justice, *A Review of the FBI's Use of NSLs: Assessment of Progress in Implementing Recommendations and Examination of Use in 2007 through 2009* (Aug. 2014) ("*NSL Report III*"). ...................................................................................................... 11, 12

Domestic Investigations and Operations Guide App. § G.12.............................................. 8

Editorial, *On Press Freedom, Eric Holder Makes the Right Call,* Wash. Post (Jan. 16, 2015) .......... 7

Justice Department Report on Revised Media Guidelines (July 12, 2013) ............................... 6

Kimberly Chow, *Revising the Attorney General's Guidelines,*
The News Media and The Law (Winter 2015) ......................................................... 7

*Ltr. from Reporters Comm. to Attorney General Holder* (June 21, 2013)................................ 5

*Ltr. from Reporters Comm. to Attorney General Holder* (June 28, 2013)................................ 5

Maria Bustillos, *What It's Like to Get a National-Security Letter*,
The New Yorker (June 27, 2013) ....................................................................... 11

ODNI, *Statistical Transparency Report Regarding Use of National Security Authorities*
(Apr. 2016)................................................................................................ 11

OIG, *Recommendations Issued by the Office of the Inspector General That Were Not Closed As of March 31, 2016* (May 4, 2016)........................................................................... 15

Raymond Bonner, *How a Telecom Helped the Government Spy on Me*,
ProPublica (Oct. 3, 2013)................................................................................ 14

Remarks by the President at the National Defense University (May 23, 2013) ........................... 5

Reporters Committee for Freedom of the Press,
*Summary of Changes to the Attorney General Guidelines* (July 30, 2013)........................... 7

Requests for Info. Under the Elec. Commc'ns Privacy Act, 32 Op. O.L.C. 2 (2008)..................... 12

Ryan Lizza, *How Prosecutors Fought to Keep Rosen's Warrant Secret,*
The New Yorker (May 24, 2013) ....................................................................... 5

Sherman, Mark, *Gov't Obtains Wide AP Phone Records in Probe*,
Associated Press, May 13, 2013 ..................................................................... 5, 12

Statement of Attorney General Eric Holder on the Justice Department Report on Revised Media Guidelines (July 12, 2013)................................................................................ 6

Steve Coll, *The Reporter Resists His Government*, N.Y. Rev. Books (Feb. 19, 2015) ................ 7

USAM 9-13.400 (Apr. 2016)............................................................................... 7

Zalesin, Jeff, *AP Chief Points to Chilling Effect After Justice Investigation*,
  The Reporters Comm. for Freedom of the Press (June 19, 2013) .................................................. 13

**Regulations**
28 C.F.R. § 50.10 .......................................................................................................................*passim*

**INTRODUCTION**

This federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, case arises out of the refusal of the Federal Bureau of Investigation ("FBI"), a component of the U.S. Department of Justice ("DOJ" or "Defendant"), to release records requested by Plaintiff Freedom of the Press Foundation ("Plaintiff") regarding the FBI's use of national security letters ("NSLs") and exigent letters to obtain the toll billing records of journalists.  The Reporters Committee for Freedom of the Press and 37 other media organizations (collectively, "*amici*") write in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment to emphasize the critical importance to the press and the public of access to information about the manner in which the FBI seeks to use legal process to obtain the toll billing records of reporters and news organizations.  Because compelled disclosure of journalists' communications records has a corrosive effect upon the ability of the press to gather news and report on matters of public concern, transparency about the rules and practices that govern the FBI's use of national security process to target journalists and the press for investigative purposes is crucial.

In February 2014, and again in January 2015, in response to concerns about the seizure of journalists' communications records, the Department of Justice revised its policies, which date back to 1970, governing the use of legal process to obtain information from or records of members of the news media, including toll billing records (the "Guidelines").  *See* 28 C.F.R. § 50.10.  During this period of time, the Department met repeatedly with representatives of the news media, including the Reporters Committee and companies in this coalition, about the progress of its revisions.  As amended, the Guidelines impose limitations on the use of many forms of process, including subpoenas, search warrants, and orders under the Stored Communications Act, to obtain information from non-consenting members of the news media or from their communications service providers.  *Id.*

The Justice Department did not hide the fact at the time that the revised Guidelines do not apply to all forms of process that could be used against the press.  Although NSLs are a form of subpoena, and are akin to other types of process expressly regulated by the Guidelines, Defendant restates in this case that the Guidelines do not extend to NSLs and has asserted that the FBI's internal procedures and policies that *do* regulate the use of NSLs to obtain journalists' communications records are exempt from disclosure under FOIA.  It makes this contention about the need for secrecy even though the existence of such a policy is on the public record and a redacted version of it was made available through unrelated FOIA litigation before the current Guidelines were revised.

Defendant's own efforts to amend the Guidelines show that publicly available rules and procedures constraining the government's ability to compel production of, among other things, journalists' telephone and email records, are essential to ensuring public confidence that the government's investigative methods do not impermissibly infringe on First Amendment rights.  In the absence of public disclosure of the policies governing NSLs and exigent letters, it is impossible to assess the structures through which the FBI is allowed to obtain these materials outside of the protections of the Guidelines.  Warrantless, secret acquisition of journalists' communications records damages the ability of reporters to safeguard the confidentiality of their sources and to pursue stories free from government interference, which, in turn, hampers the media's ability to fulfill its constitutionally recognized role of keeping the public informed.  Whatever the government might argue about the rationale for concealing specific NSL requests or exigent letters, it is hard to fathom why the policy itself must remain hidden.  For these reasons, as well as those set forth in Plaintiff's opposition, *amici* urge this Court to deny Defendant's Motion for Summary Judgment.

**INTEREST OF AMICI CURIAE**[1]

The Reporters Committee for Freedom of the Press ("Reporters Committee"), ALM Media, LLC, American Society of News Editors, The Associated Press, Association of Alternative Newsmedia, Association of American Publishers, Inc., BuzzFeed, Cable News Network, Inc., California Newspaper Publishers Association, Chicago Tribune Company, LLC, Committee to Protect Journalists, The Daily Beast Company LLC, The E.W. Scripps Company, First Amendment Coalition, First Look Media Works, Inc., Gannett Co., Inc., Gawker Media LLC, International Documentary Assn., Investigative Reporters and Editors, Investigative Reporting Workshop at American University, Los Angeles Times Communications LLC, The McClatchy Company, The Media Consortium, MPA – The Association of Magazine Media, National Press Photographers Association, The New York Times Company, The News Guild - CWA, Newspaper Association of America, North Jersey Media Group Inc., Online News Association, ProPublica, Radio Television Digital News Association, Reporters Without Borders, Student Press Law Center, TEGNA Inc., and the Tully Center for Free Speech (collectively, "*amici*") submit this brief in support of the Plaintiff in this matter.  Plaintiff has consented to this filing.  The Government takes no position on this filing.  *Amici* hereby incorporate by reference the statement of interest and descriptions of identity of *amici* set forth in the motion for leave to file this brief as *amicus curiae*.  Additional counsel for *amici* are set forth in Appendix A.

**ARGUMENT**

**I.   The manner in which the FBI uses legal process to obtain journalists' toll billing records is of substantial interest and importance to the media and the public.**

The Department of Justice's Guidelines governing the issuance of warrants or subpoenas to members of the news media and for telephone toll records of members of the news media, as well as

---

[1] No counsel for a party authored this brief in whole or in part, nor did any person or entity, other than *amici* or their counsel, make a monetary contribution to the preparation or submission of this brief.

the interrogation, indictment, and arrest of members of the news media, have long played an

important role in constraining the government's investigative and prosecutorial powers so as not to

infringe upon newsgathering activities protected by the First Amendment.  *See* 28 C.F.R. § 50.10.

Generally speaking, the Guidelines require the Attorney General to authorize the use of a subpoena

or warrant to obtain records, including communications records, of a member of the news media.  §

50.10(a)(3) .  .  The "affected member of the news media" must also be given "reasonable and

timely notice" of the request.  § 50.10(a)(4) .  .  The Guidelines do not refer to NSLs, exigent letters,

or Foreign Intelligence Surveillance Act ("FISA") warrants or applications, and thus leave open

serious questions as to the FBI's practices regarding the availability and use of NSLs to obtain

communications records of journalists and news organizations.

The Guidelines are not limited to subpoenas issued *directly* to members of the news media.

They also regulate the issuance of subpoenas to third party entities for reporters' toll billing records,

which include incoming and outgoing telephone calls.  Prior to 2014, however, the Guidelines

imposed fewer requirements on third-party subpoenas for toll billing records than on subpoenas

directed at a member of the news media.  For example, while the pre-2014 Guidelines required the

government to pursue negotiations with a member of the news media before issuing a subpoena

directed at that person, if the government sought toll billing records, it was required only to pursue

negotiations "where the responsible Assistant Attorney General determines that such negotiations

would *not* pose a substantial threat to the integrity of the investigation in connection with which the

records are sought."  28 C.F.R. § 50.10(d) (1980) (emphasis added).  As a result, the pre-2014

Guidelines codified a presumption that members of the media would *not* have the opportunity to

negotiate with the Department of Justice before investigators sought and obtained their toll billing

records from a third party.

In 2013, reports of two separate incidents of the government's use of subpoena and search warrant authority to obtain communications records of members of the news media provoked public outcry and prompted the government to revise the Guidelines.  First, news outlets reported that Defendant had secretly subpoenaed two months' worth of records from twenty Associated Press ("AP") telephone lines.  *See* Mark Sherman, *Gov't Obtains Wide AP Phone Records in Probe*, Associated Press, May 13, 2013, http://bit.ly/11zhUOg.

Shortly thereafter, the public learned that the FBI had identified Fox News journalist James Rosen as a "co-conspirator" in a search warrant application so that it could obtain his emails in connection with a criminal investigation into a suspected leak of classified information by one of the reporter's sources.  *See Application for Search Warrant for E-mail Account [redacted]@gmail.com*, No. 1:10-mj-00291-AK (D.D.C., Affidavit in support of application for search warrant, unsealed Nov. 7, 2011).  According to news accounts, Rosen was unaware of the existence of the search warrant until it was reported in *The Washington Post*.  *See* Ryan Lizza, *How Prosecutors Fought to Keep Rosen's Warrant Secret,* The New Yorker (May 24, 2013), http://bit.ly/1TD3How.

These reports stunned the news media and the country.  In response, President Obama stated that he had directed then-Attorney General Eric Holder to "review existing Department of Justice guidelines governing investigations that involve reporters, and he'll convene a group of media organizations to hear their concerns as part of that review."  Remarks by the President at the National Defense University (May 23, 2013), *available at* http://1.usa.gov/1EJEpTw.  A coalition of over 50 news media organizations led by the Reporters Committee submitted comments to the Department regarding ways to update and improve the news media Guidelines.  *Ltr. from Reporters Comm. to Attorney General Holder* (June 21, 2013), *available at* http://bit.ly/1X12I88; *Ltr. from Reporters Comm. to Attorney General Holder* (June 28, 2013), *available at* http://bit.ly/1THVbtV.

In the months after the AP subpoenas and Rosen search warrant became public, Attorney General Holder "personally held seven meetings with approximately 30 news media organizations as well as with First Amendment groups, media industry associations and academic experts," and the Justice Department issued a public report outlining its revisions to the Guidelines and previewing the formal changes in the Code of Federal Regulations.  Statement of Attorney General Eric Holder on the Justice Department Report on Revised Media Guidelines (July 12, 2013), http://1.usa.gov/1P1g5SJ; *see also* Justice Department Report on Revised Media Guidelines (July 12, 2013), *available at* http://1.usa.gov/1TTieSt ("Justice Department Report").

The Justice Department Report made clear that revisions to the Guidelines would make significant policy changes.  First and foremost, the Justice Department acknowledged the need to "reverse and expand the presumption concerning notice to, and negotiations with," members of the news media whose records the Department seeks, either directly or from third parties.  *Id.* at 2.  The Justice Department Report stated that "[a]dvance notice will afford members of the news media the opportunity to engage with the Department regarding the proposed use of investigative tools to obtain communications or business records, and also provide the news media with the opportunity to challenge the government's use of such tools in federal court."  *Id.*  Second, the Justice Department Report stated that the Department "would revise current policy" to require heightened scrutiny and high-level approval for search warrants and court orders issued under the Stored Communications Act, 18 U.S.C. § 2703(d), seeking records belonging to members of the news media.  *Id.* at 3.  The Justice Department Report further called for formalized guidance and updated training materials for the Department's attorneys and law enforcement officials, *id.* at 5–6, as well as the creation of a News Media Dialogue Group ("Dialogue Group") "to discuss any policy issues relating to the application of the Department's news media policies."  *Id.* at 6.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

After these reforms were codified in amended regulations released in February 2014,

Attorney General Holder convened a meeting of the Dialogue Group, in which the Reporters

Committee's executive director and 10 other journalists and lawyers participated, to facilitate

discussion between stakeholders including Department of Justice prosecutors, journalists and news

media organizations, and civil society.  *See* Kimberly Chow, *Revising the Attorney General's

Guidelines,* The News Media and The Law (Winter 2015), *available at* http://bit.ly/1WPSaI6.

Among other issues, the Dialogue Group addressed the textual changes to the amended Guidelines,

as well as the Department's effort to compel *New York Times* reporter James Risen to testify in the

Espionage Act trial of Jeffrey Sterling, a former government employee whom the government

suspected had leaked classified information to Risen.  Steve Coll, *The Reporter Resists His*

*Government*, N.Y. Rev. Books (Feb. 19, 2015), http://bit.ly/22qKT1x.  The Dialogue Group also

addressed the need for the Department to update crucial internal training documents, policies and

procedures, including the United States Attorneys' Manual ("USAM"), to reflect its revisions to the

Guidelines.  The Guidelines were further revised in January 2015, and the Department updated the

USAM in April 2016 to correspond with the new Guidelines requirements.  *See* USAM 9-13.400

(Apr. 2016); *see also* Editorial, *On Press Freedom, Eric Holder Makes the Right Call,* Wash. Post

(Jan. 16, 2015), http://wapo.st/1Y6Zi2y (commending the Department for making revisions to the

Guidelines).

Notwithstanding these reforms, neither the Justice Department Report nor the Guidelines as

amended mention NSLs or other forms of process, such as FISA warrants, that closely resemble

subpoenas and search warrants.  *See* Reporters Committee for Freedom of the Press, *Summary of*

*Changes to the Attorney General Guidelines* (July 30, 2013), http://bit.ly/1TErRo3.  At the time that

the Justice Department Report was issued, it was widely understood that revisions to the Guidelines

would not address the FBI's ability to obtain journalists' toll billing records using NSLs.  *See*

Charlie Savage, *Holder Tightens Rules on Getting Reporters' Data*, N.Y. Times (July 12, 2013), http://nyti.ms/1QUpeIK.  And the FBI's position that the requirements of the Guidelines do not apply to NSLs is not new.  In an appendix to the Domestic Investigations and Operations Guide ("DIOG") entitled "National Security Letters For Telephone Toll Records of Members of the News Media or News Organizations" released pursuant to an unrelated FOIA lawsuit in 2011, the FBI states, "The [28 C.F.R. § 50.10] regulation concerns *only* grand jury subpoenas, not National Security Letters (NSLs) or administrative subpoenas."  DIOG App. § G.12  (Emphasis added).

In light of Defendant's distinction between, on the one hand, subpoenas and warrants covered by the Guidelines, and, on the other, NSLs and other forms of national security process, the Government's reluctance to disclose what policies or procedures do apply to NSLs seeking journalists' communications records is troubling.  While it is evident that the FBI has adopted at least some policies and procedures specifically applicable to the use of NSLs to seek journalists' toll billing records, *see* DIOG App. § G.12, it now seeks to keep those rules secret, claiming, among other things, that disclosure would enable the targets of such requests—journalists and news organizations—to purportedly circumvent the law.  Gov't Mot. for Summ. J. at 22, 24.  Public access to such information is critical, and FOIA requires its disclosure.

**II. The FBI's use of NSLs and exigent letters to obtain journalists' toll billing records is a matter of particular public interest and concern.**

**A. NSLs, and the secrecy surrounding them, imperil the confidential relationship between reporters and sources.**

Throughout the Guidelines revisions process, access to the policies and procedures that regulate the Justice Department's ability to compel disclosure of journalists' communications records has proven critical to the press and to the public.  Yet in this and other cases, the government has fought to keep secret its own rules, policies, and procedures that regulate the ways in which it may use NSLs and other forms of process in order to obtain journalists' toll billing records.  The relevant DIOG appendix released in 2011 is heavily redacted but suggests that there

are approval requirements and specific procedures necessary to use an NSL for telephone records of members of the news media and news organizations.  The government's position that releasing these policies and procedures would enable individuals to "evade detection and circumvent the law," Gov't Mot. for Summ. J. at 22, 24, is not only without merit, but also inconsistent with the spirit and purpose of the Guidelines, as amended.

Public disclosure of the rules governing the use of NSLs and other national security process to target journalists is especially critical because NSLs lack other safeguards typically present to protect First Amendment rights.  NSLs are frequently used at the early stages of investigations "to connect investigative subjects with particular telephone numbers or e-mail addresses" in order to support later applications for Foreign Intelligence Surveillance Act warrants, subpoenas, or electronic surveillance orders.  *See* OIG, *A Review of the Federal Bureau of Investigation's Use of National Security Letters* xxiv (Mar. 2007) ("NSL Report I").  While the material that the government may obtain using an NSL is not coextensive with what it may obtain using a grand jury subpoena—for example, NSLs may not compel the disclosure of content—like subpoenas and Stored Communications Act orders, NSLs can compel disclosure of toll billing records.  18 U.S.C. § 2709.  *Amici* are especially concerned that the FBI may seek to use NSLs instead of subpoenas or Stored Communications Act orders specifically in order to avoid the Guidelines requirements that would otherwise apply, including exhaustion of alternative sources for the information sought.  *See* 28 C.F.R. § 50.10.  In addition, the process for issuing an NSL outlined in the Electronic Communications Privacy Act prohibits an NSL recipient from notifying a target (or any other person) of the request.  18 U.S.C. § 2709(d).[2]  This provision is thus incompatible with the

---

[2] These nondisclosure requirements also give the FBI "the power to determine, on a case-by-case basis, whether to allow NSL recipients to speak about the NSLs."  *In re NSLs*, Order *20, No. 11-cv-02173-SI (N.D. Cal. Mar. 29, 2016), *available at* http://bit.ly/1sRZ2c7.  Yet the government has also resisted the application of procedural safeguards to the NSL nondisclosure regime, arguing that the "statutory protections" now embedded in the NSL provision are sufficient to obviate the need

Guidelines, which create a presumption that the government must provide a news media subpoena target with notice of the request.  28 C.F.R. § 50.10(a)(4).  Nor do NSLs require oversight or approval by the Department of Justice or its attorneys.

Likewise, Defendant's reluctance to make public its approval requirements and procedures for issuing NSLs to obtain journalists' toll billing records stands in stark contrast to the publicly available Guidelines, which govern the FBI's use of subpoenas and search warrants to obtain identical information in criminal and civil investigations.  The codification of the Guidelines, which are intended to "provide protection to members of the news media from certain law enforcement tools, whether criminal or civil, that might unreasonably impair newsgathering activities," facilitates transparency with regard to the Department's investigative practices that affect the news media.  28 C.F.R. § 50.10.  Yet Defendant here maintains that the rules—not any specific information relating to particular NSLs but merely the rules themselves—that apply to acquiring reporters' toll billing records using forms of process not expressly referenced in the Guidelines must remain secret.

The Guidelines—and the cooperative dialogue process that informed the 2014 and 2015 revisions—make clear that knowing what types of information regarding journalists' communications the government can obtain without notice or judicial process is of the utmost importance to reporters and media organizations.  Yet not only has the government continued to obscure its own interpretations of the nature and scope of its authority to compel disclosure of communications records through the use of an NSL, but nondisclosure requirements imposed on NSL recipients have also severely limited the public's ability to know how NSLs are being utilized in practice to obtain communications records, including journalists' records.  *See* 18 U.S.C. § 2709(d) (prohibiting an NSL recipient from notifying any person of the request).  Because any

---

for additional protections overseen by the judicial branch.  *Id.* at 22 (rejecting government's contention that *Freedman v. Maryland*, 380 U.S. 51 (1965), does not apply to nondisclosure scheme).

*Freedom of the Press Foundation v. United States Dep't of Justice*, Case No. 15-cv-03503-HSG
Brief *Amicus Curiae* of the Reporters Committee for Freedom of the Press

10

NSLs seeking communications records of journalists would be issued to third-party providers, the journalists themselves would be unaware of the requests—and thus unable to challenge them in court—because of the nondisclosure requirements.

Data available from the Department of Justice's Office of the Inspector General ("OIG"), which has issued three major reports on the FBI's NSL usage, indicates that although hundreds of thousands of NSLs have been issued in the last decade overall, very few recipients have been permitted to speak openly about the experience.  The most recent data from the OIG demonstrates that, on average, approximately 44,000 NSLs were issued each year from 2003 to 2011.  OIG, *A Review of the FBI's Use of NSLs: Assessment of Progress in Implementing Recommendations and Examination of Use in 2007 through 2009* 65 (Aug. 2014) ("*NSL Report III*").  A recent report by the Office of the Director of National Intelligence ("ODNI") indicates that in calendar year 2015, the FBI issued 12,870 NSLs, which collectively included 48,642 "requests for information" from third-party service providers.  ODNI, *Statistical Transparency Report Regarding Use of National Security Authorities* 9 (Apr. 2016).  And, in an earlier report, the OIG concluded based on the review of a random sample of NSLs that 97 percent of those issued imposed nondisclosure requirements.  OIG, *A Review of the FBI's Use of NSLs: Assessment of Corrective Actions and Examination of NSL Usage in 2006* 124 (Mar. 2008)  ("*NSL Report II*").

The result of the all-too-common nondisclosure requirements that accompany NSLs has been to keep the public and press largely in the dark regarding the government's use of this form of legal process.  To date, only a small number of NSL recipients have contested such nondisclosure requirements in court.[3]  Indeed, only a handful of NSL attachments—the portion of the subpoena

---

[3] *See, e.g.*, Maria Bustillos, *What It's Like to Get a National-Security Letter*, The New Yorker (June 27, 2013), http://nyr.kr/1A1TkRm (reporting on the Internet Archive's successful challenge to an NSL it received in 2008); Alison Leigh Cowan, *Four Librarians Finally Break Silence in Records Case*, N.Y. Times (May 31, 2006), http://nyti.ms/1A1TdFA (reporting on the successful effort by a Connecticut library consortium to lift an NSL gag order); *see also In re NSLs*, No. 11-cv-02173-SI

that sets out the types of information sought—have been made publicly available.  *See Merrill v. Lynch*, No. 14-CV-9763 (VM), 2015 WL 9450650 at *11 (S.D.N.Y. Aug. 28, 2015) (lifting nondisclosure order); *see also* Chris Madsen, *Yahoo Announces Public Disclosure of National Security Letters*, Yahoo! Global Public Policy (Jun. 1, 2016), http://bit.ly/1XgPzb3.  In addition, the only publicly available government interpretation of the FBI's authority to compel the production of electronic communications records is a 2008 memo from the Office of Legal Counsel ("OLC"), which concluded that NSLs may only be used to seek subscriber information, "toll billing records," and "parallel" categories of information.  *See* Requests for Info. Under the Elec. Commc'ns Privacy Act, 32 Op. O.L.C. 2 (2008).  The OLC, however, acknowledged that ambiguity exists in the application of the phrase "toll billing records" to electronic communications.  *See NSL Report III*, at 74.  Nondisclosure requirements prevent the public from knowing how the FBI interprets this ambiguous authority to compel production of electronic "toll billing records" and what types of communications records it believes it is authorized to seek with NSLs.

There is no question that, regardless of the specific legal mechanism, compelling production of journalists' communications records has a real and detrimental impact on the press.  After the news broke that the Department of Justice had subpoenaed the metadata from phone lines used by more than 100 AP reporters and editors—i.e. the timing and duration of calls, as well as the associated telephone numbers, *see* Sherman, *Gov't Obtains Wide AP Phone Records in Probe*, *supra*—AP President and CEO Gary Pruitt stated that sources were less willing to talk to AP reporters: "Some of our longtime trusted sources have become nervous and anxious about talking to us, even on stories that aren't about national security."  Jeff Zalesin, *AP Chief Points to Chilling*

---

(N.D. Cal. Mar. 29, 2016),; *In re NSL*, No. 2:13-cv-1048-RAJ (W.D. Wash. May 21, 2014) (granting stipulated motion to lift nondisclosure order that prevented Microsoft from disclosing the existence of an NSL).

*Effect After Justice Investigation*, The Reporters Comm. for Freedom of the Press (June 19, 2013), http://rcfp.org/x?CSPl.

The lack of information regarding the scope of the FBI's legal authority to use NSLs or other national security process to obtain communications records belonging to journalists makes it difficult for journalists and the media industry to assess whether the Guidelines are effectively protecting the interests they are designed to serve.  It is and has been evident that the government has ways around the Guidelines, but Defendant's unwillingness to disclose the FBI's own rules regarding these practices raises serious concerns among the public and the press about the potential for excessive reliance on national security process in cases that implicate newsgathering, and the impact of these tools on First Amendment rights.

### B. The FBI has previously disregarded regulatory protections for the press by using informal requests to obtain news media records.

As discussed in detail above, *supra* pp. 3–8, federal regulations constrain the circumstances under which the FBI can use certain enumerated tools to obtain records of members of the news media.  28 C.F.R. § 50.10.  Nevertheless, the FBI has a history of attempting to circumvent these regulatory requirements by seeking records of members of the news media using informal requests such as exigent letters rather than the forms of process identified in the § 50.10 regulations.  As a result, disclosure of the policies that govern the use of exigent letters to obtain journalists' communications records is equally critical to understanding how the Guidelines affects the FBI's use of national security tools.

In 2007, during the OIG's first review of NSL usage, the OIG found that the FBI had frequently sought telephone toll billing records or subscriber information by using an exigent letter rather than statutory methods of NSLs or grand jury subpoenas.  *NSL Report I* at 87.  In a follow-up investigation, the OIG identified three leak investigations in which journalists' records had been requested using methods that did not comply with 28 C.F.R. § 50.10.  OIG, *A Review of the Federal*

*Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone*

*Records* 89 (Jan. 2010), *available at* https://oig.justice.gov/reports/2014/o1411.pdf ("Exigent

Letters Report").  In one instance, the FBI obtained from a telephone provider 22 months of records

for reporter Ellen Nakashima, 22 months of records for *The Washington Post* bureau in Jakarta, as

well as records for journalists Alan Sipress, Natasha Tampubolon, Raymond Bonner and Jane

Perlez using an exigent letter.  *See id.* at 95, 101; *see also* Raymond Bonner, *How a Telecom*

*Helped the Government Spy on Me*, ProPublica (Oct. 3, 2013 2:00 PM),

https://www.propublica.org/article/how-a-telecom-helped-the-government-spy-on-me.  OIG called

this "a complete breakdown in the required Department procedures for approving the issuance of

grand jury subpoenas for reporters' toll billing records."  Exigent Letters Report at 103.

In another leak investigation, an FBI agent emailed a telephone company analyst with "the

name and cellular phone number of a reporter, facts explaining the relevance of calling activity by

the reporter to the investigation, and information indicating that the cellular phone number of the

reporter was in contact with the target number of the subpoena during a particular period."  *Id.* at

116.  Several phone companies then queried their own databases to obtain the reporter's records.

OIG wrote that this was "a clear abuse of authority, in violation of the ECPA, federal regulation,

and Department policy."  *Id.* at 121.

The OIG "concluded that serious lapses in training, supervision, and oversight led to the

abuses involving the FBI's improper requests for reporters' records" in these instances.  *Id.* at 279.

In response, the OIG recommended that "[t]he FBI, in conjunction with the National Security

Division (NSD) and other relevant [Justice] Department components, should review current policies

and procedures governing [classified and redacted] reporters by Department personnel."  *Id.* at 288.

A recent status report issued by the OIG indicates that the status of this recommendation is "On

Hold/Pending."  OIG, *Recommendations Issued by the Office of the Inspector General That Were*

1   *Not Closed As of March 31, 2016* ¶ 702 (May 4, 2016), *available at*

2   https://oig.justice.gov/reports/2016/r160504.pdf.

3          The use of exigent letters to obtain journalists' communications records is of significant

4   interest not only to the individual members of the press whose records may be sought, but also to

5   the media industry, which relies on the Guidelines to ensure that individuals and organizations are

6   given notice and an opportunity to be heard before the government compels production of their

7   communications records.  Indeed, the FBI's prior use of exigent letters to obtain the records of

8   journalists in violation of both ECPA and the § 50.10 regulations underscores the powerful interest

9   of both the press and the public at large in understanding the manner in which the FBI's policies

10  and procedures constrain—or allow—the use of process not governed by the Guidelines to obtain

11  records of journalists' communications.

12

13                                      **CONCLUSION**

14         For the reasons stated above, this Court should deny the government's motion for summary

15  judgment and grant Plaintiff's cross-motion for summary judgment.

16

17  Dated: June 10, 2016                    Respectfully submitted,

18

19                                          */s/Katie Townsend*_____
                                            Katie Townsend
20                                          *Counsel of Record for Amici Curiae*
                                            Bruce Brown*
21                                          Hannah Bloch-Wehba*
                                            *Of Counsel**
22                                          THE REPORTERS COMMITTEE FOR
                                            FREEDOM OF THE PRESS
23

24

25

26

27

28

# APPENDIX A

Dana Rosen
Senior Vice President and General Counsel
ALM Media, LLC
120 Broadway, 5th Floor
New York, NY 10271

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors* and *Association of Alternative Newsmedia*

Karen Kaiser
General Counsel
The Associated Press
450 W. 33rd Street
New York, NY 10001

Jonathan Bloom
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for The Association of American Publishers, Inc.*

Allison Lucas
General Counsel and EVP Legal
Nabiha Syed
Assistant General Counsel
BuzzFeed
200 Fifth Avenue, 8th Floor
New York, NY 10010

David C. Vigilante
Johnita P. Due
Cable News Network, Inc.
1 CNN Center
Atlanta, GA 30303

Jim Ewert
General Counsel
California Newspaper Publishers Association
2000 O Street, Suite 120
Sacramento, California 95811

Julia Atcherley
The Daily Beast Company LLC
555 W. 18th St., 2nd Floor
New York, NY 10011

David M. Giles
Vice President/
Deputy General Counsel
The E.W. Scripps Company
312 Walnut St., Suite 2800
Cincinnati, OH 45202

Peter Scheer
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

Lynn Oberlander
General Counsel, Media Operations
First Look Media Works, Inc.
18th Floor
114 Fifth Avenue
New York, NY 10011

Barbara W. Wall
Senior Vice President & Chief Legal Officer
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
(703)854-6951

Heather Dietrick
*President and General Counsel*
Courtenay O'Connor
*Deputy General Counsel*
Gawker Media
114 Fifth Avenue
New York, New York 10011

Juan Cornejo
The McClatchy Company
2100 Q Street
Sacramento, CA 95816

James Cregan
Executive Vice President
MPA – The Association of Magazine Media
1211 Connecticut Ave. NW Suite 610
Washington, DC 20036

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

Jonathan Hart
Ashley Messenger
Micah Ratner
National Public Radio, Inc.
1111 North Capitol St. NE
Washington, D.C. 20002

David McCraw
V.P./Assistant General Counsel
The New York Times Company
620 Eighth Avenue
New York, NY 10018

Barbara L. Camens
Barr & Camens
1025 Connecticut Ave., NW
Suite 712
Washington, DC 20036
*Counsel for The Newspaper Guild – CWA*

Kurt Wimmer
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
*Counsel for the Newspaper Association of America*

Jennifer A. Borg
General Counsel
North Jersey Media Group Inc.
1 Garret Mountain Plaza
Woodland Park, NJ 07424

Laura R. Handman
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006

Thomas R. Burke
Davis Wright Tremaine LLP
Suite 800
500 Montgomery Street
San Francisco, CA 94111

*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

Bruce W. Sanford
Mark I. Bailen
James Romoser
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional Journalists*

Frank D. LoMonte
Student Press Law Center
1608 Rhode Island Ave., NW
Suite 211
Washington, D.C. 20036

Chris Moeser
TEGNA Inc.
7950 Jones Branch Drive
McLean, VA 22107

Karen H. Flax
Tribune Publishing Company
435 North Michigan Ave.
Chicago, IL 60611
kflax@tribune.com

Jeff Glasser
Tribune Publishing Company
202 W. 1st Street
Los Angeles, CA 90012
jglasser@latimes.com

*Freedom of the Press Foundation v. United States Dep't of Justice*, Case No. 15-cv-03503-HSG
Brief *Amicus Curiae* of the Reporters Committee for Freedom of the Press

2