Marcia Hofmann (Cal. Bar No. 250087)
Zeitgeist Law PC
25 Taylor St.
San Francisco, CA 94102
marcia@zeitgeist.law
Telephone: (415) 830-6664

Ahmed Ghappour (Cal. Bar No. 255723)
200 McAllister St.
San Francisco, CA 94102
ghappour@uchastings.edu
Telephone: (415) 598-8605

Attorneys for Plaintiff
FREEDOM OF THE PRESS FOUNDATION

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FREEDOM OF THE PRESS FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>Defendant. | Case No. 3:15-cv-03503-HSG<br><br>**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**AND**<br><br>**NOTICE OF CROSS MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  August 18, 2016<br>Time:  2:00 p.m.<br>Place:  Courtroom 10, 19th Floor<br>Judge: Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

NOTICE OF MOTION ............................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 2

I.    INTRODUCTION ..................................................................................................... 2

II.   STATEMENT OF FACTS ....................................................................................... 2

    A.   THE JUSTICE DEPARTMENT HAS PUBLISHED ITS RULES FOR COLLECTING INFORMATION
         ABOUT JOURNALISTS IN LAW ENFORCEMENT INVESTIGATIONS, BUT THESE RULES DO
         NOT DISCLOSE HOW THE FBI USES NATIONAL SECURITY LETTERS TO OBTAIN RECORDS
         ABOUT MEMBERS OF THE PRESS ........................................................................... 2

    B.   THE PUBLIC HAS AN INTEREST IN KNOWING WHETHER AND HOW THE FBI USES
         NATIONAL SECURITY LETTERS TO GATHER INFORMATION ABOUT THE PRESS BECAUSE
         THE FBI HAS A LONG HISTORY OF MISUSING THIS INVESTIGATIVE TOOL ........................ 5

    C.   FPF'S FREEDOM OF INFORMATION ACT REQUEST ............................................... 9

III.  ARGUMENT ............................................................................................................ 10

    A.   THE FREEDOM OF INFORMATION ACT AND THE STANDARD OF REVIEW ........... 10

    B.   FPF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE GOVERNMENT HAS IMPROPERLY
         WITHHELD AGENCY RECORDS ........................................................................ 11

        1.   The Government Has Failed to Meet the Procedural Requirements Necessary to
             Sustain Their Burden Under the FOIA ................................................ 11

        2.   The Government Has Failed to Perform an Adequate Search for Records
             Responsive to FPF's FOIA Request ...................................................... 12

        3.   The Government Has Improperly Withheld Agency Records Under Exemptions
             1 and 3 .................................................................................................. 14

            (a)   The Government Has Failed to Meet Its Burden of Showing that the
                  Withheld Material Is Intelligence Sources or Methods for Purposes of
                  Exemptions 1 and 3 ................................................................... 15

            (b)   The Government Has Failed to Show that Disclosure of the Withheld
                  Documents Would In Fact Reveal Intelligence Sources or Methods ............. 17

        4.   The Government Has Improperly Withheld Agency Records Under
             Exemption 5 ....................................................................................... 19

            (a)   The Government Has Failed to Show that Records Have Been Properly
                  Withheld Pursuant to the Deliberative Process Privilege ............................. 19

- i -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.
CASE NO. 3:15-CV-03503-HSG

1

(b)    The Government Has Failed to Show that Records Have Been Properly

2     Withheld Pursuant to the Attorney-Client Privilege ...................................... 22

3     5.    The Government Improperly Withheld Records Under Exemption 7(E) ................25

4     6.    The Government Has Officially Acknowledged Information Withheld Under

5     All Claimed Exemptions ............................................................................34

6     7.    The Government Has Failed to Segregate Exempt Materials From Non-Exempt

     Material as the FOIA Requires ................................................................34

7   IV.    CONCLUSION ............................................................................................... 35

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot.
Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.
Case No. 3:15-cv-03503-HSG

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACLU v. FBI,*
    428 F. Supp. 2d 179 (D.D.C. 2006) ..................................................................15

*Admiral Ins. Co. v. U.S. Dist. Ct.,*
    881 F.2d 1486 (9th Cir. 1989)..........................................................................24

*Assembly of the State of Cal. v. Assembly Comm. on Elections,*
    968 F.2d 916 (9th Cir. 1992)............................................................................20

*Berman v. CIA,*
    501 F.3d 1136 (9th Cir. 2007)..........................................................................17

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..........................................................................................11

*Church of Scientology v. Dep't of Army,*
    611 F.2d 738 (9th Cir. 1980)..........................................................11, 18, 34, 35

*CIA v. Sims,*
    471 U.S. 159 (1985)..........................................................................................18

*Citizens Comm'n on Human Rights v. Food & Drug Admin.,*
    45 F.3d 1325 (9th Cir. 1995)............................................................................13

*Coastal States Gas Corp. v. Dep't of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) ..............................................................20, 22, 24

*Ctr. for Biological Diversity v. Office of Mgmt. & Budget,*
    625 F. Supp. 2d 885 (N.D. Cal. 2009) .............................................................23

*Dep't of Air Force v. Rose,*
    425 U.S. 352 (1976)..........................................................................................10

*Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
    489 U.S. 749 (1989)....................................................................................10, 11

*Eisenberg v. Ins. Co. of N. Am.,*
    815 F.2d 1285 (9th Cir. 1987)..........................................................................11

*Electronic Frontier Foundation v. CIA,*
    No. 09-3351 SBA, 2013 WL 5443048 (N.D. Cal. Sept. 30, 2013) ....................16

- iii -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.
CASE NO. 3:15-CV-03503-HSG

*Electronic Frontier Foundation v. Nat'l Sec. Agency,*
    No. 14-cv-03010-RS, 2016 WL 1059389 (N.D. Cal. March 18, 2016)................................34

*F.T.C. v. Warner Communications Inc.,*
    742 F.2d 1156 (9th Cir. 1984)................................................................................................19

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990) ..............................................................................................34

*Hamdan v. United States,*
    797 F.3d 759 (9th Cir. 2015)..........................................................................................14, 26

*Hickman v. Taylor,*
    329 U.S. 495 (1947) .........................................................................................................23, 24

*Hunt v. CIA,*
    981 F.2d 1116 (9th Cir. 1992).................................................................................15, 16, 19

*In re National Security Letter,*
    930 F. Supp. 2d 1064 (N.D. Cal. 2013) ................................................................................6

*In re National Security Letters,*
    Case Nos. 11-cv-2173-SI, 13-mc-80089 SI & 13-cv-1165 SI (N.D. Cal. March 29, 2016)...6

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) ..............................................................................................20

*In re Subpoena Served Upon the Comptroller of the Currency,*
    967 F.2d 630 (D.C. Cir. 1992) ..............................................................................................20

*ITT World Commc'ns, Inc. v. F.C.C.,*
    699 F.2d 1219 (D.C. Cir. 1983), *rev'd on other grounds,* 466 U.S. 463 (1984) .................21

*Jordan v. Dep't of Justice,*
    591 F.2d 753 (D.C. Cir. 1978) ..............................................................................................19

*Judicial Watch, Inc. v. U.S. Postal Service,*
    297 F. Supp. 2d 252 (D.D.C. 2004) ......................................................................................21

*Kamman v. IRS,*
    56 F.3d 46 (9th Cir. 1995).....................................................................................................11

*King v. Dep't of Justice,*
    830 F.2d 210 (D.C. Cir. 1987) ...............................................................................12, 15, 26

*Long v. IRS,*
    742 F.2d 1173 (9th Cir. 1984)...............................................................................................15

*Maricopa Audubon Soc'y v. U.S. Forest Serv.*,
  108 F.3d 1089 (9th Cir. 1997) ............................................................................20

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
  566 F.2d 242 (D.C. Cir. 1977) ...............................................12, 25, 34, 35

*Minier v. CIA*,
  88 F.3d 796 (9th Cir. 1992) ..........................................................................15, 17

*Morley v. CIA*,
  508 F.3d 1108 (D.C. Cir. 2007) .......................................................................12

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.*,
  861 F.2d 1114 (9th Cir. 1988) ......................................................................10, 19

*NDRC v. Dep't of Defense*,
  388 F. Supp. 2d 1086 (C.D. Cal. 2005) ...........................................................34

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978) .........................................................................................10

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) .........................................................................................19

*Rosenfeld v. U.S. Dep't of Justice*,
  57 F.3d 803 (9th Cir. 1995) ..........................................................................15, 27

*Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. Dep't of Justice*,
  823 F.2d 574 (D.C. Cir. 1987) .........................................................................24

*Strang v. Collyer*,
  710 F. Supp. 9 (D.D.C. 1989), *aff'd*, 899 F.2d 1268 (D.C. Cir. 1990) ................20

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*,
  60 F.3d 867 (1st Cir.1995) ...............................................................................20

*United States v. Chen*,
  99 F.3d 1495 (9th Cir. 1996) ...........................................................................24

*United States v. Martin*,
  278 F.3d 988 (9th Cir. 2002) ...........................................................................23

*United States v. Munoz*,
  233 F.3d 1117 (9th Cir. 2000) .........................................................................23

*United States v. Rozet*,
  183 F.R.D. 662 (N.D. Cal. 1998) ................................................................20, 22

- v -

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ............................................................................................23

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ...................................................................*passim*

*Weil v. Inv. Indicators, Research & Mgmt., Inc.*,
    647 F.2d 18 (9th Cir. 1981)..............................................................................23

*Wiener v. FBI*,
    943 F.2d 972 (9th Cir. 1991)........................................................................*passim*

*Yonemoto v. Dep't of Veterans Affairs*,
    686 F.3d 681 (9th Cir. 2012)............................................................................11

*Zemansky v. U.S. Envtl. Prot. Agency*,
    767 F.2d 569 (9th Cir. 1985)............................................................................12

**STATE CASES**

*Scott v. Beth Israel Med. Ctr.*,
    847 N.Y.S.2d 436 (N.Y. Sup. Ct. 2007) ........................................................25

**FEDERAL STATUTES**

5 U.S.C. § 552 ........................................................................................................*passim*

5 U.S.C. § 552(a)(4)(B)...............................................................................................11

5 U.S.C. § 552(b) .................................................................................................10, 34

5 U.S.C. § 552(b)(1).............................................................................................*passim*

5 U.S.C. § 552(b)(3).............................................................................................*passim*

5 U.S.C. § 552(b)(5).............................................................................................10, 19

5 U.S.C. § 552(b)(6)....................................................................................................10

5 U.S.C. § 552(b)(7)....................................................................................................25

5 U.S.C. § 552(b)(7)(C)...............................................................................................10

5 U.S.C. § 552(b)(7)(E).........................................................................................*passim*

12 U.S.C. § 3414.................................................................................................*passim*

- vi -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.
CASE NO. 3:15-CV-03503-HSG

15 U.S.C. § 1681 ................................................................................................*passim*

18 U.S.C. § 2709 ................................................................................................*passim*

50 U.S.C. § 3024 ..........................................................................................14, 15, 18

50 U.S.C. § 3162 ........................................................................................................5

50 U.S.C. § 436 ..........................................................................................................5

**FEDERAL RULES**

Fed. R. Civ. P. 56 .....................................................................................................11

**FEDERAL REGULATIONS**

28 C.F.R. § 16.5 .........................................................................................................9

28 C.F.R. § 50.10 ...............................................................................................*passim*

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend. I ........................................................................................3, 6, 30

**LEGISLATIVE MATERIALS**

Pub. L. No. 109-177, § 119(a), 120 Stat. 192 (2006).................................................6

Pub. L. No. 114-23, 129 Stat. 283-268 ..................................................................5, 6

**OTHER AUTHORITIES**

Ann E. Marimow, *A Rare Peek Into a Justice Department Leak Probe*, WASH. POST,
   May 19, 2013 ........................................................................................................3

Ann E. Marimow, *Justice Department's Scrutiny of Fox News Reporter James Rosen in Leak
   Case Draws Fire*, WASH. POST, May 20, 2013 .....................................................3

Charlie Savage & Leslie Kaufman, *Phone Records of Journalists Seized by U.S.*, N.Y. TIMES,
   May 13, 2013 ........................................................................................................2

Dep't of Justice Office of the Inspector General, *A Review of the FBI's Use of National Security
   Letters: Assessment of Corrective Actions and Examination of NSL Usage in 2006*
   (March 2008).........................................................................................................6

Dep't of Justice Office of the Inspector General, *A Review of the Federal Bureau of Investigation's
   Use of Exigent Letters and Other Informal Requests for Telephone Records* (Jan. 2010) (re-
   released Nov. 24, 2014) ........................................................................................7

- vii -

Dep't of Justice Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of National Security Letters: Assessment of Progress in Implementing Recommendations and Examination of Use in 2007 through 2009* 190-93 (Aug. 2014) .......8

Dep't of Justice Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of National Security Letters* (March 9, 2007) (re-released Feb. 20, 2016) .....................6

Dep't of Justice, *Report on Review of News Media Policies* (July 12, 2013) ....................................3

Ellen Nakashima, *FBI Wants Access to Internet Browser History Without a Warrant in Terrorism and Spy Cases*, WASH. POST, June 6, 2016 ...........................................................9

*House Republicans Challenge Holder Testimony on Reporter Surveillance*, FOXNEWS.COM, May 29, 2013 ...................................................................................................................3

Jenna McLaughlin, *FBI Kept Demanding Email Records Despite DOJ Saying It Needed a Warrant*, THE INTERCEPT, June 2, 2016 ...................................................................9

Letter from Chairman Bob Goodlatte, House Judiciary Comm., and Chairman F. James Sensenbrenner, Jr., Crime, Terrorism, Homeland Security, and Investigations Subcomm., to Attorney General Eric Holder, Dep't of Justice (May 29, 2013) ........................................3

Letter from Gary Pruitt, Exec. President & CEO, Associated Press, to Attorney General Eric Holder, Dep't of Justice (May 13, 2013) ..............................................................2

Policy Regarding Obtaining Information From, or Records of Members of the News Media; and Regarding Questioning, Arresting or Charging Members of the News Media, 79 Fed. Reg. 10989-01 (Feb. 27, 2014) ..........................................................................4

Updated Policy Regarding Obtaining Information From, or Records of Members of the News Media; and Regarding Questioning, Arresting or Charging Members of the News Media, 80 Fed. Reg. 2819-01 (Jan. 21, 2015) ..................................................................4

**NOTICE OF MOTION**

TO DEFENDANT AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 18, 2016 at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 10 on the 19th Floor of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, plaintiff Freedom of the Press Foundation ("FPF") will, and hereby does, cross move for summary judgment.

Pursuant to Federal Rule of Civil Procedure 56, FPF respectfully asks that this Court issue an order requiring the government to release all records improperly withheld from the public under the Freedom of Information Act ("FOIA"). This cross motion is based on this notice of cross motion, the memorandum of points and authorities in support of this cross motion, the Declaration of Marcia Hofmann and attached exhibits, all papers and records on file with the Clerk or which may be submitted prior to or at the time of the hearing, and any further evidence which may be offered.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

This is an action under the Freedom of Information Act, 5 U.S.C. § 552, seeking the disclosure of records from the Federal Bureau of Investigation ("FBI") concerning the agency's rules and procedures for obtaining records about members of the news media through National Security Letters ("NSLs")—a highly controversial law enforcement tool. The Department of Justice ("DOJ") has moved for summary judgment, asking the Court to approve its decision to withhold a substantial portion of the requested records. Because the government has failed to meet its burden both procedurally and substantively, the Court should deny the government's motion for summary judgment and grant FPF's cross motion for summary judgment. FPF respectfully requests entry of an order compelling the DOJ immediately to disclose all improperly withheld records.

### II.     STATEMENT OF FACTS

#### A.      The Justice Department Has Published Its Rules for Collecting Information About Journalists in Law Enforcement Investigations, But These Rules Do Not Disclose How the FBI Uses National Security Letters to Obtain Records About Members of the Press

The Justice Department has long recognized the importance of striking the proper balance between its vast investigative powers and respecting the freedom of the press. For years, the agency has published its guidelines for how and when officers may use subpoenas and other investigative tools to gather information about members of the news media during law enforcement investigations. 28 C.F.R. § 50.10 ("Media Guidelines"). Agents are required to observe strict procedures when compelling production of journalists' telephone records and obtaining other information pursuant to these guidelines.

Despite these procedures, the Associated Press ("AP") revealed in May 2013 that investigators had secretly seized telephone records for at least twenty phone lines used by its reporters and editors to communicate with confidential sources and others. Letter from Gary Pruitt, Exec. President & CEO, Associated Press, to Attorney General Eric Holder, Dep't of Justice (May 13, 2013) (Hofmann Decl. Ex. 1); *see also* Charlie Savage & Leslie Kaufman, *Phone Records of Journalists Seized by U.S.*, N.Y. TIMES, May 13, 2013, at A1 (Hofmann Decl. Ex. 2).

- 2 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.
CASE NO. 3:15-CV-03503-HSG

The AP condemned the government's broad collection of its telephone records as a "serious interference" with its First Amendment rights and a "massive and unprecedented intrusion" into its newsgathering activities. Hofmann Decl. Ex. 1.

Just six days later, the Washington Post reported that the DOJ had investigated journalist James Rosen, chief Washington correspondent for Fox News, in connection with a possible leak of classified information by a government contractor. Ann E. Marimow, *A Rare Peek Into a Justice Department Leak Probe*, WASH. POST, May 19, 2013 (Hofmann Decl. Ex. 3). Fox News called the event "downright chilling" and said it would "unequivocally defend [Rosen's] right to operate as a member of what up until now has always been a free press." Ann E. Marimow, *Justice Department's Scrutiny of Fox News Reporter James Rosen in Leak Case Draws Fire*, WASH. POST, May 20, 2013 (Hofmann Decl. Ex. 4).

In response to these events, members of Congress voiced alarm about the Justice Department's apparent disregard for press freedom protections in its Media Guidelines. Letter from Chairman Bob Goodlatte, House Judiciary Comm., and Chairman F. James Sensenbrenner, Jr., Crime, Terrorism, Homeland Security, and Investigations Subcomm., to Attorney General Eric Holder, Dep't of Justice (May 29, 2013) (Hofmann Decl. Ex. 5); *see also House Republicans Challenge Holder Testimony on Reporter Surveillance*, FOXNEWS.COM, May 29, 2013.[1]

Amid increasing criticism from Congress and the public, President Obama directed the Justice Department to re-evaluate its practices and policies for using law enforcement tools to access records and other information related to members of the press. Dep't of Justice, *Report on Review of News Media Policies* 1 (July 12, 2013) (Hofmann Decl. Ex. 6). The DOJ subsequently vowed to tighten the rules for how and when the agency could use subpoenas, court orders, and warrants to conduct surveillance of journalists in leak-related investigations.  Hofmann Decl. Ex. 6 at 2-6.

---

[1] Available at http://fxn.ws/12OsiNz.

But the DOJ made no mention of revising its procedures for issuing NSLs—a type of administrative subpoena discussed below in II.B—to gather information about members of the press. Furthermore, the Media Guidelines are silent on NSLs. *See* 28 C.F.R. § 50.10.

This omission is particularly important because the Associated Press and Fox News investigations reportedly involved possible leaks of classified information, Hofmann Decl. Exs. 2, 3 & 4, and were likely national security investigations. NSLs would have been an available tool for agents to obtain certain records in those investigations per the FBI's Domestic Investigations and Operations Guide ("DIOG").[2] Annex G to that guide specifically permits the use of NSLs to collect telephone toll records of members of the news media or media organizations. *See* unclassified 2011 version of Annex G (Hofmann Decl. Ex. 7).

The possibility that the FBI might use NSLs to gather information about journalists is not merely hypothetical: Pulitzer Prize-winning journalist Barton Gellman has reportedly been told that the FBI obtained his phone records using this investigatory tool. Darren Samuelsohn, *Barton Gellman Aware of Risks,* POLITICO (Feb. 25, 2014) (Hofmann Decl. Ex. 8) ("Gellman said he's been told his phone records were obtained at one point through a National Security Letter[.]").

The DOJ published a final rule updating the Media Guidelines in the Federal Register on February 27, 2014, and then amended the guidelines again in January 2015 after further consultation with representatives of the media.[3] At no time did the FBI disclose or explain its procedures for using NSLs to obtain records about members of the press—but in a statement to the New York Times, a DOJ spokesman assured the public that the FBI's use of NSLs is subject to an

---

[2] The full unclassified version of the 2011 DIOG is available at https://vault.fbi.gov/ FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20(DIOG) (last visited June 10, 2016).

[3] Policy Regarding Obtaining Information From, or Records of Members of the News Media; and Regarding Questioning, Arresting or Charging Members of the News Media, 79 Fed. Reg. 10989-01 (Feb. 27, 2014) (amending 28 C.F.R. § 50.10); Updated Policy Regarding Obtaining Information From, or Records of Members of the News Media; and Regarding Questioning, Arresting or Charging Members of the News Media, 80 Fed. Reg. 2819-01 (Jan. 21, 2015) (amending 28 C.F.R. § 50.10).

- 4 -

"extensive oversight regime."  Charlie Savage, *Holder Tightens Rules on Getting Reporters' Data*, N.Y. TIMES, July 12, 2013, at A1 (Hofmann Decl. Ex. 9).

The "extensive oversight regime" for using NSLs to gather information about journalists remains secret, however. The location of these rules is in Annex G to the DIOG—an unclassified 2011 version of which has been published by the FBI. Hofmann Decl. Ex. 7. The section of that document explaining the approval requirements for such NSLs is almost completely redacted, however. Hofmann Decl. Ex. 7 at G-17. Email correspondence released by the FBI through this litigation shows that Annex G was likely updated in 2014. FPF-284-85 (Hofmann Decl. Ex. 10).

If the approval requirements in Annex G are less onerous than those in the Media Guidelines, FBI agents are incentivized to use NSLs whenever possible. This possibility is of particular concern because the FBI has long been known to misuse its power to issue NSLs, largely due to poor oversight.

**B.     The Public Has an Interest in Knowing Whether and How the FBI Uses National Security Letters to Gather Information About the Press Because the FBI Has a Long History of Misusing This Investigative Tool**

The FBI has authority under 18 U.S.C. § 2709 to issue NSLs to obtain subscriber information, toll billing records, and transactional records from wire or electronic communications service providers in investigations involving international terrorism or clandestine intelligence activities.[4] Prior to June 2015, the FBI issued these NSLs without any prior judicial review, and Section 2709(c) allowed the FBI to impose indefinite nondisclosure orders on NSL recipients.[5] Thus, the FBI had extraordinary discretion to issue these demands unilaterally and shroud them in secrecy with little oversight. No other form of legal process left so much discretion to the FBI—

---

[4] A variety of statutes allow government agents to issue NSLs for other types of information in connection with national security investigations, including 15 U.S.C. § 1681v, 15 U.S.C. § 1681u, 12 U.S.C. § 3414, 50 U.S.C. § 3162, and 50 U.S.C. § 436. However, 18 U.S.C. § 2709 is the primary NSL authority relevant to the records sought in this case.

[5] Congress amended some of the most controversial provisions of Section 2709 in June 2015, when it passed the USA FREEDOM Act. Pub. L. No. 114-23, 129 Stat. 283-268. These changes occurred after FPF submitted the FOIA request at issue in this litigation, and are not relevant to this case.

which made it uniquely ripe for abuse. Indeed, this Court held that parts of the statutory framework for issuing Section 2709 NSLs were facially unconstitutional because they violated the First Amendment and separation of powers principles. *In re National Security Letter*, 930 F. Supp. 2d 1064, 1081 (N.D. Cal. 2013).[6]

In the USA PATRIOT Improvement and Reauthorization Act, Congress directed the DOJ Office of Inspector General ("OIG") to review the FBI's use of NSLs between 2003 and 2006. Pub. L. No. 109-177, § 119(a), 120 Stat. 192 (2006). The OIG subsequently issued two extensive reports documenting widespread, systemic misuse of NSLs throughout the FBI during that time period. *See generally* Dep't of Justice Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of National Security Letters* (March 9, 2007) (re-released Feb. 20, 2016) (excerpts at Hofmann Decl. Ex. 11);[7] Dep't of Justice Office of the Inspector General, *A Review of the FBI's Use of National Security Letters: Assessment of Corrective Actions and Examination of NSL Usage in 2006* (March 2008) (re-released Oct. 22, 2014) (excerpts at Hofmann Decl. Ex. 12).[8]

The reports revealed a broad array of infractions by the FBI, including:

- Gathering information beyond what was requested in an NSL;

- Gathering information beyond the time limits of an NSL;

- Seeking information beyond the scope of what a particular NSL statute would permit, *e.g.*, issuing a Section 2709 NSL to access an investigative target's educational records;

---

[6] This ruling was appealed to the Ninth Circuit, and then remanded to the district court for further consideration in light of the USA FREEDOM Act. The Court found that the 2015 amendments had sufficiently addressed the constitutional deficiencies. *See In re National Security Letters*, Case Nos. 11-cv-02173-SI, 3:11-cv-2667 SI, 3:13-mc-80089 SI & 3:13-cv-1165 SI, slip op. (N.D. Cal. March 29, 2016) (unsealed April 21, 2016), https://www.eff.org/files/2016/04/21/redactedorder42016.pdf.

[7] The full report is available at https://oig.justice.gov/reports/2016/NSL-2007.pdf.

[8] The full report is available at https://oig.justice.gov/reports/2014/s1410.pdf.

- Using NSLs to obtain information not relevant to an authorized national security investigation;

- Issuing NSLs after the FBI's authority to conduct an underlying investigation had ended; and

- Using NSLs to collect email subscriber information and telephone billing records about the wrong people.

Hofmann Decl. Ex. 11 at 67-68; Hofmann Decl. Ex. 12 at 131-32 & 140-42.

The OIG discovered that in addition to misusing NSLs, the FBI had issued hundreds of so-called "exigent letters" to obtain telephone records from three major telephone carriers without serving actual legal process such as NSLs or grand jury subpoenas. Hofmann Decl. Ex. 11 at 87-99; *see generally* Dep't of Justice Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records* (Jan. 2010) (re-released Nov. 24, 2014) (excerpts at Hofmann Decl. Ex. 13).[9] These exigent letters were informal requests approved by FBI officials who did not have authority to issue NSLs, were often not associated with any open investigation, were not issued in emergency circumstances, and often included false representations. Hofmann Decl. Ex. 11 at 87-99; Hofmann Decl. Ex. 13 at 2. Exigent letters were not authorized by law, flouted internal FBI policy, and violated the Attorney General's Guidelines for FBI National Security Investigations and Foreign Intelligence Collection. Hofmann Decl. Ex. 11 at 95-99.

Significantly, the OIG identified at least three media-related investigations in which the FBI improperly accessed telephone records or calling activity information for telephone numbers assigned to reporters. Hofmann Decl. Ex. 13 at 89-122. In one case, the FBI improperly used an exigent letter to obtain toll billing records of reporters from the Washington Post and New York Times.  Hofmann Decl. Ex. 13 at 37.

While the FBI adopted some corrective measures in response to the Inspector General's findings, a follow-up review of NSL use between 2007 and 2009 found that the FBI had not fully implemented several recommendations, which may have resulted in the continued use of

---

[9] The full report is available at https://oig.justice.gov/reports/2014/o1411.pdf.

Section 2709 NSLs beyond the scope permitted by law. Dep't of Justice Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of National Security Letters: Assessment of Progress in Implementing Recommendations and Examination of Use in 2007 through 2009* 190-93 (Aug. 2014) (excerpts at Hofmann Decl. Ex. 14).[10]

According to the 2014 report, the FBI implemented specific new procedures in the 2011 version of the DIOG for investigations involving the media. Hofmann Decl. Ex. 14 at 179. However, the OIG also suggested that the FBI should take additional steps to address a specific (though redacted) recommendation that the OIG had made regarding such investigations:

> In addition, we determined that the FBI should take further steps to address our recommendation concerning ███████████████. In our Exigent Letters Report, we found that the FBI conducted ███████ the FBI had obtained in response to an exigent letter. The FBI agents ███████████████████████
>
> ███████. Because of the significant First Amendment interests implicated by such ███████, as well as operational considerations such as obtaining cooperation when necessary in future exceptional circumstances, we recommended that the Department re-evaluate the policies governing the ███████ and consider under what circumstances FBI personnel may conduct ███████, including whether approval by senior FBI officials at the level of an Assistant Director or higher should be required for the conduct of ███████.
>
> Since that time, on July 12, 2013, the Department issued a report, *Report on Review of News Media Policies*, which made revisions to the Department's policies regarding investigations that ███████. Although this report did not specifically address ███████, we believe the FBI should consult with the Department to determine whether the recent policy changes warrant any revisions to the DIOG's procedures for conducting ███████, including the approval level required before such ███████.

Hofmann Decl. Ex. 14 at 192.

This excerpt suggests that the FBI has specific procedures in the DIOG for obtaining information about journalists through NSLs and/or exigent letters—likely in Annex G—but these rules remain unknown to the public. This information is critical to informed public debate about the

---

[10] The full report is available at https://oig.justice.gov/reports/2014/s1408.pdf.

proper scope and use of NSL authority, which remains active and ongoing today. *See, e.g.*, Ellen Nakashima, *FBI Wants Access to Internet Browser History Without a Warrant in Terrorism and Spy Cases*, WASH. POST, June 6, 2016; Jenna McLaughlin, *FBI Kept Demanding Email Records Despite DOJ Saying It Needed a Warrant*, THE INTERCEPT, June 2, 2016.[11]

### C.    FPF's Freedom of Information Act Request

In a letter to the FBI dated March 10, 2015, FPF requested under the FOIA all records from January 2009 to the present concerning:

> (A) the extensive regime, rules, guidelines, or infrastructure that oversees the issuance of NSLs or exigent letters to obtain records regarding a member of the media;
>
> (B) the current procedures that FBI agents must undertake in advance of issuing a NSL or exigent letter to obtain records regarding any member of the media, including any pre-approval process;
>
> (C) the current procedures that FBI agents must undertake after issuing a NSL or exigent letter to obtain records regarding any member of the media, including any mandatory subsequent reporting process; and
>
> (D) any changes in FBI policy, procedure, or practice after the issuance of the U.S. Department of Justice, *Report on Review of News Media Policies* (2013) and U.S. Department of Justice, *Updated Policy Regarding Obtaining Information From, or Records of, Members of the News Media; and Regarding Questioning, Arresting, or Charging Member of the News Media* (2015).

Def.'s Mot. Summ. J. Hardy Decl. Ex. A at 2.

FPF asked that the processing of the request be expedited because disclosure of the requested documents is in the public interest and "[a] matter of widespread and exceptional media interest in which there exist[s] possible questions about the government's integrity which affect public confidence." 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(d)(1)(iv). Hardy Decl. Ex. A at 4. By letter dated March 20, 2015, the FBI acknowledged receipt of the FOIA request and informed FPF that its request for expedited processing had been granted. Hardy Decl. Exs. B & C.

---

[11] Available at https://www.washingtonpost.com/world/national-security/fbi-wants-access-to-internet-browser-history-without-a-warrant-in-terrorism-and-spy-cases/2016/06/06/2d257328-2c0d-11e6-9de3-6e6e7a14000c_story.html and https://theintercept.com/2016/06/02/fbi-kept-demanding-email-records-despite-doj-saying-it-needed-a-warrant.

After receiving no further response, FPF filed an administrative appeal with the DOJ's Office of Information Policy ("OIP") by letter dated May 18, 2015. Hardy Decl. Ex. D. On July 15, 2015, OIP sent a letter to FPF stating that no adverse determination had been made by the FBI, so there was no decision for OIP to consider on appeal.  Hardy Decl. Ex. F.

FPF filed suit on July 30, 2015 seeking the immediate processing and release of all records responsive to its FOIA request. Compl. (Dkt. 1). The FBI then processed FPF's request, identifying 302 responsive pages and withholding a substantial amount of information pursuant to 5 U.S.C. § 552(b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). Hardy Decl. ¶ 15-16.

Upon reviewing the released documents and the FBI's explanations for their withholdings, FPF has decided not to challenge withholdings under Exemptions 6 and 7(C), and pages that are duplicates. *See* Hardy Decl. ¶ 4. Furthermore, FPF does not challenge the FBI's invocation of Exemption 7(E) to withhold secure FBI email address, faxes, and telephone numbers within the records marked with the Bates numbers FPF-155, 209, 276, 281, 287, 289-290, and 400. Hardy Decl. ¶ 68. However, the rest of the material withheld whole or in part remains at issue.

## III.    ARGUMENT

### A.    The Freedom of Information Act and the Standard of Review

The Freedom of Information Act is intended to safeguard the American public's right to know "what their Government is up to." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). The core purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Toward that end, "disclosure, not secrecy, is the dominant objective" of the FOIA. *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

The statute requires an agency to disclose records at the request of the public unless the records fall within one of nine narrow exemptions. 5 U.S.C. § 552(b). If records do not fit squarely into one of these categories, the agency must release them. *Robbins Tire & Rubber*, 437 U.S. at 221; *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1116 (9th Cir. 1988).

FOIA cases are usually decided on motions for summary judgment because disputes of material fact are uncommon. *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012). The Court grants summary judgment when no genuine dispute of material fact remains and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The government bears the burden of proving that a particular document is exempt from disclosure. 5 U.S.C. § 552(a)(4)(B); *Reporters Comm.*, 489 U.S. at 755. A court considers the government's withholding of agency records de novo, and may review documents *in camera* to determine whether exemptions have been properly asserted. 5 U.S.C. § 552(a)(4)(B). An agency may submit affidavits to satisfy its burden, but "may not rely upon conclusory and generalized allegations of exemptions." *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir. 1995) (quoting *Church of Scientology v. Dep't of Army*, 611 F.2d 738, 742 (9th Cir. 1980) (internal quotation marks omitted)).

## B.   FPF Is Entitled to Summary Judgment Because the Government Has Improperly Withheld Agency Records

The government has failed to satisfy its burden of proving that it has released all non-exempt material in response to FPF's FOIA requests. The Court should deny the government's motion for summary judgment and grant FPF's cross motion for summary judgment, requiring DOJ to release all material it has improperly withheld under the FOIA.

### 1.   The Government Has Failed to Meet the Procedural Requirements Necessary to Sustain Their Burden Under the FOIA

In *Vaughn v. Rosen*, the D.C. Circuit established the procedural requirements that "an agency seeking to withhold records must follow in order to carry its burden. 484 F.2d 820, 828 (D.C. Cir. 1973). *Vaughn* requires that "when an agency seeks to withhold information it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C.

Cir. 1977) (citations omitted).[12] The Ninth Circuit has held that an agency must "identify[] each document withheld, the statutory exemption claimed, and a particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption." *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991). "Specificity" is the "defining requirement" of an agency's *Vaughn* submission, and affidavits cannot sustain summary judgment if they are "conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *King v. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987); *Zemansky v. U.S. Envtl. Prot. Agency*, 767 F.2d 569, 571 (9th Cir. 1985) (An agency can only satisfy its burden through "reasonably detailed, nonconclusory affidavits submitted in good faith.").

Here, the government has submitted precisely the type of conclusory *Vaughn* submission that the courts have long rejected. The inadequacy of the *Vaughn* submission leaves FPF and the Court unable to assess the validity of the defendants' claims that the disputed material is exempt from disclosure. Regardless, "when an agency seeks to withhold information, it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and *correlating those claims with the particular part of a withheld document* to which they apply." *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (emphasis added; citations and internal quotation marks omitted). Based upon this failure alone, the Court should deny the government's motion for summary judgment.

### 2.   The Government Has Failed to Perform an Adequate Search for Records Responsive to FPF's FOIA Request

The government's search for responsive records was not reasonably calculated to uncover all relevant documents, and was therefore inadequate. The agency bears the burden of showing that it has conducted a search "reasonably calculated to uncover all relevant documents." *Zemansky*, 767 F.2d at 571. The adequacy of the agency's search is "judged by a standard of reasonableness,"

---

[12] The *Vaughn* requirements are typically satisfied through an agency's submission of an affidavit describing the basis for its withholdings and providing justifications for redactions, accompanied by an index listing responsive records and indicating the precise redactions made to the records. We refer to the Hardy Declaration and the *Vaughn* index collectively herein as a "*Vaughn* submission."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in which the court "constru[es] the facts in the light most favorable to the requestor." *Citizens Comm'n on Human Rights v. Food & Drug Admin.*, 45 F.3d 1325, 1328 (9th Cir. 1995). The Hardy Declaration shows that the FBI failed to perform an adequate search.

First, the FBI explains that it reviewed the DIOG for responsive material, and identified only section 18 of the guide as potentially responsive to FPF's FOIA request. Hardy Decl. ¶ 21. The government failed to identify Annex G to the DIOG, which specifies the procedures for issuing NSLs to obtain telephone records of members of the news media and news organizations— and is directly responsive to FPF's request. *See* Hofmann Decl. Ex. 7 (unclassified 2011 version made publicly available by the DOJ).

This omission is particularly egregious when email correspondence identified as responsive and released to FPF specifically discusses the annex and includes an attached draft update. *See* FPF-284-85 (Hofmann Decl. Ex. 10). And yet the draft update does not appear to be accounted for in the government's *Vaughn* submission, either, suggesting that the FBI failed to identify it as a responsive record.[13]

Second, FPF's FOIA request sought records generated between January 2009 and March 10, 2015. Hardy Decl. ¶ 8; Hardy Decl. Ex. A. But the records identified by the FBI appear to be primarily from 2014 and 2015, with the earliest definitively dated record from September 15, 2011. Hardy Decl. Ex. I. (Three records listed in the *Vaughn* index are undated.) The dearth of responsive records between 2009 and 2011 is surprising, considering that the FBI revised and updated the DIOG in October 2011.[14] Presumably records responsive to FPF's request would have

---

[13] While we think it is unlikely (based on page length), there is a possibility that this draft update of the annex is accounted for in sub-category 1.B of the government's *Vaughn* index. If so, the document's description in the index is so devoid of detail that we are unable to identify it.

[14] As the FBI explains, "The FBI's Domestic Investigations and Operations Guide (DIOG) was revised and updated based on comments and feedback received since the original DIOG was issued on December 16, 2008. This new version was approved by Director Mueller on October 15, 2011. The changes primarily clarify and enhance the definitions of terms and procedures used in the original DIOG. Each change has been carefully looked at and considered against the backdrop of the tools our employees need to accomplish their mission, the possible risks associated with the use of those tools, and the controls that are in place." *See* https://vault.fbi.gov/FBI%20Domestic%20In vestigations%20and%20Operations%20Guide%20(DIOG) (last visited June 10, 2016).

been generated prior to and during the DIOG revisions, but none appear to have been uncovered by the FBI's search. It does not appear that the FBI's search for responsive records covered the full time period specified in FPF's request.

As these conspicuous omissions show, the government's search for responsive records was not reasonably calculated to uncover all relevant documents; and was therefore inadequate.

### 3. The Government Has Improperly Withheld Agency Records Under Exemptions 1 and 3

The government has invoked Exemptions 1 and 3 to withhold seven full pages related to the DIOG's provisions on NSLs, claiming that they contain classified intelligence information that also constitutes "intelligence sources and methods" pursuant to the National Security Act. Hardy Decl. ¶¶ 34-50; Hardy Decl. Ex. I at 2.

Specifically, the DOJ asserts that the information is exempt from disclosure under Exemption 1 because it has been classified pursuant to Executive Order 13526, § 1.4(c) as "intelligence activities . . . intelligence sources or methods, or cryptology." Hardy Decl. ¶¶ 40-43. Exemption 1 exempts from disclosure "matters that are . . . (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The government characterizes the information withheld under Exemption 1 specifically as "intelligence activities or methods." Hardy Decl. ¶¶ 41-42.

The government also withholds these pages under Exemption 3, which only applies to records "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). Here, the government invokes Section 102A(i)(1) of the National Security Act of 1947 (codified at 50 U.S.C. § 3024(i)(1)), which authorizes the Director of National Intelligence to "protect from unauthorized disclosure intelligence sources and methods." Hardy Decl. ¶¶ 49-50. To determine whether Exemption 3 applies, the Court "asks first whether the statute identified by the agency is a statute of exemption within the meaning of Exemption 3, and then whether the withheld records satisfy the criteria of that exemption statute." *Hamdan v. United States*, 797 F.3d 759, 776 (9th Cir. 2015).

Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot.
Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.
Case No. 3:15-cv-03503-HSG

The National Security Act qualifies as a statute of exemption within the meaning of Exemption 3, so the only question is whether the requested information falls within the scope of the statute and the documents reveal "intelligence sources and methods." *Minier v. CIA*, 88 F.3d 796, 801 (9th Cir. 1992).

Though an agency's affidavits are entitled to deference, the Court performs a de novo review of Exemption 1 claims and "is ultimately to make its own decision" about the propriety of the withholding. *ACLU v. FBI*, 428 F. Supp. 2d 179, 188 (D.D.C. 2006). The agency's determination that information meets the criteria of an Exemption 3 statute is also subject to de novo review. *Long v. IRS*, 742 F.2d 1173, 1182 (9th Cir. 1984).

### (a)   The Government Has Failed to Meet Its Burden of Showing that the Withheld Material Is Intelligence Sources or Methods for Purposes of Exemptions 1 and 3

The government has failed to meet its burden of proving that the withheld pages fall within Exemptions 1 and 3. As an initial matter, the FBI has not provided a sufficiently detailed explanation of what this material even is, which denies FPF "a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." *Wiener*, 943 F.2d at 981 (citing *King*, 830 F.2d at 218). To sustain its invocation of Exemption 1, the government is required to show with "particularity" how disclosure might reveal intelligence activities or methods. *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 807 (9th Cir. 1995). It must provide "a particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption." *Wiener*, 943 F.2d at 977; *Rosenfeld*, 57 F.3d at 807. These justifications must be "sufficiently detailed" and not "bear any indicia of unreliability." *ACLU*, 429 F. Supp. 2d at 188.

In order to justify invoking Exemption 3, the agency must submit "a *detailed* affidavit showing that the information *logically* falls within the claimed exemptions." *Minier*, 88 F.3d at 800 (quoting *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992)) (emphasis added). In essence, it must provide both reason and facts to support its decision. *Hunt*, 981 F.2d at 1120. "[G]eneral assertions" will not do. *Rosenfeld*, 57 F.3d at 807 (quoting *Wiener*, 943 F.2d at 981). It must also

- 15 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.
CASE NO. 3:15-CV-03503-HSG

show that its justifications "are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Hunt*, 981 F.2d at 1119.

The government explains that the seven pages withheld under Exemptions 1 and 3 fall within a larger group of twenty-four pages containing "both a portion and a draft portion of the DIOG regarding NSLs," but provides no further detail about the specific information withheld pursuant to this exemption. Hardy Decl. ¶¶ 26 & 34-50.[15] To support its Exemption 1 claim, the FBI characterizes the withheld information as properly classified "intelligence activities and methods" and provides a boilerplate explanation of why disclosure could be expected to cause serious damage to national security. Hardy Decl. ¶¶ 42-44. The FBI makes no effort to tailor the explanation to the specific withheld material, falling short of the particularized justification required by the FOIA.

In another FOIA case before this Court, Judge Armstrong rejected a similar *Vaughn* showing offered by the FBI to justify withholding documents under Exemption 1. *Electronic Frontier Foundation v. CIA*, No. 09-3351 SBA, 2013 WL 5443048, at *10 (N.D. Cal. Sept. 30, 2013). In that case, as here, the FBI failed to provide a "relatively detailed justification identifying the specific reasons" why information was withheld under Exemption 1, instead stating "in general terms why each category of information should be withheld and the anticipated consequences of disclosure. Like the 'boilerplate' explanations rejected in *Wiener*, the FBI's explanations are categorical descriptions of redacted material coupled with the categorical indication of anticipated consequences of disclosure, which are 'clearly inadequate.'" *Id*. (citing 943 F.2d at 978-79).

The government's *Vaughn* showing is also deficient with respect to Exemption 3. Like the inadequate agency affidavit in *Wiener*, the Hardy Declaration summarily concludes that the withheld information "pertain[s] to intelligence sources and methods" and provides no facts or

---

[15] The pages are within sub-category 1.B of the *Vaughn* index, which includes "both a portion and a draft portion of the DIOG regarding NSLs." Hardy Decl. Ex. I at 2. Because of the scant description of these documents in the *Vaughn* submission, it is impossible to tell whether Exemptions 1 and 3 have been invoked to withhold information in a draft version of the DIOG, an operational version, or both.

reasoning to support that conclusion. Hardy Decl. ¶ 50. The description in the *Vaughn* index is just as bare: "Seven pages in this document contain information pertaining to sources and methods." Hardy Decl. Ex. I at 2. As the Ninth Circuit has found, a *Vaughn* showing fails to justify an Exemption 3 withholding where it "does little more than recite the language" of the exemption statute. *Wiener*, 943 F.2d at 982. The government's reliance on the incantation of "sources and methods" without any further explanation does not provide enough specificity to carry the government's burden. *Cf. Berman v. CIA*, 501 F.3d 1136, 1141 (9th Cir. 2007) (conversely finding adequate declarations where the agency explained that a number of *specific* sources would be revealed by disclosure of withheld information). Indeed, the agency fails to assert that the document would even *reveal* sources or methods—it merely states the withheld information *pertains* to them. Hardy Decl. ¶ 50; Hardy Decl. Ex. I at 2. These conclusions, with nothing more, "den[y] the plaintiff the opportunity to contest the [agency's] conclusions, and thus distort[s] the adversary process." *Berman*, 501 F.3d at 1141.

Finally, the *Vaughn* showing is unsatisfactory because it relies on unsound logic: "Given that Congress specifically prohibited the disclosure of information pertaining to 'intelligence sources and methods' used by the [intelligence community] as a whole, I have determined that the information withheld pursuant to Exemption (b)(3) in the records at issue comprise FBI's intelligence sources and methods." Hardy Decl. ¶ 50. The government argues that because Congress prohibits the disclosure of "sources and methods," disclosure of the records would comprise "sources and methods." *Id.* This circular reasoning does not provide this Court with a sufficient rationale for the withholding and cannot withstand this Circuit's requirement that an agency show that information logically falls within a claimed exemption. *Minier*, 88 F.3d at 800.

### (b)    The Government Has Failed to Show that Disclosure of the Withheld Documents Would In Fact Reveal Intelligence Sources or Methods

The DOJ has also failed to demonstrate that the disclosure of the pages withheld under Exemptions 1 and 3 would reveal sources or methods.

In *CIA v. Sims*, the Supreme Court found that the plain meaning of "sources and methods" should apply when interpreting the National Security Act. 471 U.S. 159, 105 (1985). In that case, the Court found that documents revealing the names of individuals performing research in a special operation were protected "sources" under the statute. *Id.* at 105. The Court further explained that "intelligence methods" would "encompass[] *covert* means of obtaining information, the disclosure of which might close access to certain kinds of information." *Id.* at 192 n.7 (emphasis added; internal quotations omitted).

Disclosure of these seven pages should not reveal any sources or methods within the plain meaning of those words, and so they are both improperly classified and withheld under Exemptions 1 and 3. Unlike in *Sims*, no names of individuals or institutions were sought nor should be revealed in these documents. *See* Hardy Decl. Ex. A at 2. FPF's request simply asks for the FBI's procedures for issuing NSL and exigent letters to obtain information about the news media. These procedures will not reveal any sources, just as the DOJ's publicly available rules for issuing other types of legal process to investigate the news media do not reveal any sources. *See* 28 C.F.R. § 50.10. And if sources are somehow identified in the documents, they could easily be redacted— and it is the DOJ's burden to segregate all reasonably exempt information withheld under Exemptions 1 and 3 and disclose all non-exempt information, just as under any other exemption. *Church of Scientology*, 611 F.2d at 744; *Hamdan*, 797 F.3d at 779.

Moreover, these documents would not reveal any secret intelligence methods. The FBI's use of NSLs as an investigative tool is publicly acknowledged and well documented by the DOJ itself. The FBI has already publicly disclosed an unclassified, partially redacted version of the DIOG. This guide acknowledges and provides details about the FBI's use of NSLs to gather information in national security investigations generally, as well as news media-related national security investigations specifically. *See* DIOG § 18.6.6 (Hofmann Decl. Ex. 15); Hofmann Decl. Ex. 7. Moreover, the OIG has comprehensively documented the FBI's practices associated with issuing NSLs and exigent letters in a series of reports totaling hundreds of pages that have been released over the past several years. *See* excerpts at Hofmann Decl. Exs. 11-14. The mere fact that

- 18 -

the withheld pages "relate" or "pertain" to the FBI's use of NSLs does not mean that the information would reveal secret intelligence activities or methods. Many details about the government's use of this technique are well known to the public. Where the agency has not provided this Court with sufficient basis for its Exemption 1 and 3 withholdings and these pages have been withheld in their entirety, this Court should at a minimum examine the records *in camera*. *See Hunt*, 981 F.2d at 1119.

### 4.    The Government Has Improperly Withheld Agency Records Under Exemption 5

The FOIA contains a narrow exemption for "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Courts have interpreted this exemption to shield records from disclosure if they would be "normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).

The FBI invokes both the deliberative process privilege and the attorney-client privilege to withhold records under Exemption 5. Def. Mot. Summ. J. at 14-18; Hardy Decl. ¶¶ 51-55. In both cases, the FBI has failed to provide sufficient information to determine if the privilege applies. For the attorney-client privilege claims, the FBI has not even provided conclusory assertions that align with the basic elements of the privilege, or facts that show the privilege applies.

### (a)    The Government Has Failed to Show that Records Have Been Properly Withheld Pursuant to the Deliberative Process Privilege

The deliberative process privilege protects records that "reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated." *Sears*, 421 U.S. at 150; *F.T.C. v. Warner Communications Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). For the privilege to apply, "a document must be both 'predecisional' or 'antecedent to the adoption of agency policy' and 'deliberative,' meaning it must actually be related to the process by which the policies are formulated." *Nat'l Wildlife Fed'n*, 861 F.2d at 1117 (quoting *Jordan v. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978)) (emphasis in

- 19 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.
CASE NO. 3:15-CV-03503-HSG

original); *see also Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997); *Assembly of the State of Cal. v. Assembly Comm. on Elections*, 968 F.2d 916, 920 (9th Cir. 1992). Merely showing that the two criteria are met is not enough. An agency must provide more context because "even if a document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *United States v. Rozet*, 183 F.R.D. 662, 666 (N.D. Cal. 1998) (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). The agency "bears the burden of establishing the character of the decision, the deliberative process involved, and the role played by the documents in the course of that process." *Id.* at 666 (citing *Strang v. Collyer*, 710 F. Supp. 9, 11 (D.D.C. 1989), *aff'd*, 899 F.2d 1268 (D.C. Cir. 1990)) (internal quotation marks omitted).

The deliberative process privilege is a qualified privilege, and ultimately weighs the public need for the documents against the effects on internal government speech. *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997). "[W]here there is reason to believe the documents sought may shed light on government misconduct, 'the privilege is routinely denied,' on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'" *Id.* (quoting *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs,* 60 F.3d 867, 885 (1st Cir.1995)); *see also In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 634 (D.C. Cir. 1992) ("the privilege may be overridden where necessary . . . to shed light on alleged government malfeasance") (internal quotation marks and citation omitted). As discussed in II.B, the FBI had a long history of misusing its NSL authority, and has also been known to use improper means such as exigent letters to gather information about the news media. Hofmann Decl. Ex. 13 at 89-122.

When, as here, the FBI has denied public access to the finished products of the agency's process through other exemption claims, the Court should not uphold the invocation of the deliberative process privilege. "A consistent assumption running through judicial decisions permitting nondisclosure of deliberative material has been that the actual policy or legal positions

- 20 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.
CASE NO. 3:15-CV-03503-HSG

adopted will be disclosed to the public." *ITT World Commc'ns, Inc. v. F.C.C.*, 699 F.2d 1219 (D.C. Cir. 1983), *rev'd on other grounds*, 466 U.S. 463 (1984). *See also Vaughn*, 523 F.2d at 1147 n.38 (distinguishing cases in which the final product of agency decision-making was available to the public from cases where it was not). The public's right to know and understand the FBI's NSL practices with respect to the press outweigh the FBI's interest in protecting draft versions of its policies.

The government's withholdings under the deliberative process privilege are substantial. The FBI entirely withheld eighty-four pages of a draft of the FBI's policy implementation guidelines, nine pages of draft operational directives, nineteen pages of a draft policy for the OIP, and forty-three pages of a draft of the Media Guidelines, as well as portions of six pages of emails among personnel from the FBI's Office of General Counsel and twelve pages of emails about the Media Guidelines. Hardy Decl. Ex. I at 1-8. Additionally, the government redacted material under the deliberative process privilege that is unsupported by the *Vaughn* index. *See* FPF-405 (marked b5-1 on the page) at Hofmann Decl. Ex. 10.

The deliberative process claims are, on the whole, inadequately supported. For example, the FBI claims the privilege for FPF-351-393, stating in the *Vaughn* index that this is a draft of the DOJ's New Media Guidelines. Hardy Decl. Ex. I at 8. The DOJ offers no support for the claim that the release of this document would chill discussion at the FBI, but rather generally notes in the Hardy Declaration that the disclosure of *any* draft materials would "chill the full and frank discussion between agency personnel." These conclusory statements are inadequate: "An agency's affidavit must correlate facts in or about *each withheld document* with the elements of the privilege." *Judicial Watch, Inc. v. U.S. Postal Service,* 297 F. Supp. 2d 252, 259–60 (D.D.C. 2004) (emphasis added). The *Vaughn* index repeats the same stock language for most invocations of the exemption, which is notable in light of the differing origin and status of each document.

The government also conflates the agency's deliberative process with internal discussions about final policies. For example, the FBI improperly withheld portions of at least six pages of internal email exchanges between March 11, 2014 and July 28, 2015. Unredacted portions of the

emails suggest that these are not the sort of documents that the deliberative process privilege is designed to protect. The email thread in early February 2015 consists of an exchange in which an employee of the FBI's New Orleans office asks the Office of General Counsel ("OGC") for advice and guidance on agency procedures. FPF-287-290 at Hofmann Decl. Ex. 10. This does not suggest "deliberative process" within the agency, but rather that OGC had already adopted a position on a matter and was dispensing guidance to other members of the agency about how to comply with it. The deliberative process privilege should not apply to protect such formal, finalized positions. *Rozet*, 183 F.R.D. at 666; *Coastal States*, 617 F.2d at 866. Indeed, another OGC official follows up on the exchange to suggest that they share the email with the "client"—likely the Guardian Management Unit, which oversees access to databases of information—so that the unit will know what guidance the OGC is giving out. FPF-287 at Hofmann Decl. Ex. 10. Even given this limited context, it seems the deliberative process exemption was inappropriately invoked to withhold this information.

In light of these failures to properly apply the privilege, it is all the more important that the DOJ be required to demonstrate that each withheld document was predecisional, and related to a distinct policy decision. It should not be the job of this Court to line up dates in order to determine which version of a policy a draft corresponds to, if it was adopted, when it was adopted, or any of the other information that would show that the privilege applies. The FBI has failed to provide enough information in the Hardy Declaration or *Vaughn* index to evaluate the deliberative nature of these documents. The qualified nature of the privilege, and the non-public status of some of the final policies also weigh in favor of release of some of the materials claimed under the privilege. For those reasons, it has failed to meet its burden of showing that it properly invoked the deliberative process privilege.

### (b) The Government Has Failed to Show that Records Have Been Properly Withheld Pursuant to the Attorney-Client Privilege

The government also claims that certain documents would be protected in the civil discovery context under attorney-client privilege. Def. Mot. Summ. J. at 14-18. The attorney-client

privilege protects confidential communications from clients to their attorneys made for the purpose of giving legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Weil v. Inv. Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).

In this case, the FBI has not met its burden regarding any of the documents claimed under the privilege. *See Ctr. for Biological Diversity v. Office of Mgmt. & Budget*, 625 F. Supp. 2d 885, 892 (N.D. Cal. 2009). For this privilege to apply, the FBI must show that there was 1) a communication 2) between privileged persons (such as attorney and client) 3) in confidence, 4) for the purpose of seeking, obtaining or providing legal advice. *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). As in a privilege log for civil discovery, the non-producing party must show that the privilege applies to each document it seeks to protect. *United States v. Munoz*, 233 F.3d 1117, 1128 (9th Cir. 2000).

First, although the FBI has invoked the attorney-client privilege, Def. Mot. Summ. J. at 17 fn.8, much of the language in the Hardy Declaration and *Vaughn* index is only relevant to a determination of the applicability of the work product doctrine (also called the attorney work product privilege)—which the agency has not claimed. *See* Hardy Decl. ¶¶ 54 ("Exemption (b)(5) has been asserted to protect privileged *attorney work products*"), *Id.* at 52 ("Generally the *attorney work product privilege* protects documents and other memoranda prepared by an attorney . . . in reasonable anticipation of litigation"), Hardy Decl. Ex. I at 4 ("The attorney client privilege protects *tangible and intangible items* as interviews, memoranda, correspondence, mental impressions and personal *beliefs prepared ore developed by an attorney in anticipation of litigation*" [*sic*]; "This presentation was . . . *provided in anticipation of litigation* related to the FBI's issuance of national security letters; it therefore constitutes attorney client privileged information") (emphasis added to all quotes).

The attorney-client privilege and the work product doctrine are related, but they are not the same or even coextensive. *See Hickman v. Taylor*, 329 U.S. 495, 508 (1947) (noting that the attorney-client privilege is "unrelated to writings which reflect an attorney's mental impressions,

- 23 -

conclusions, opinions or legal theories" which may be covered by work product protection); *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494 (9th Cir. 1989) (discussing how the work product doctrine and the attorney-client privilege differ). Even assuming that the FBI has met the burden of showing that the documents were prepared in anticipation of litigation—which it has not, *see Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. Dep't of Justice*, 823 F.2d 574, 586 (D.C. Cir. 1987)—such a showing is orthogonal to the criteria of the attorney-client privilege. Documents can be prepared in anticipation of litigation without being for the purpose of providing legal advice, as the documents in *Hickman* were. Thus, the *Vaughn* submission fails to present information specific to each document that tracks the elements of attorney-client privilege.

Moreover, the *Vaughn* submission fails to provide enough factual detail to determine with the attorney-client privilege has been properly invoked. For example, the *Vaughn* index states that the withheld records were prepared by lawyers in the course of their professional duties within the FBI. Hardy Decl. Ex. I at 3-7. But the mere fact that a person is a lawyer does not make all documents prepared by or communications with that person privileged. *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). The FBI cannot claim the attorney-client privilege on the mere ground that the communications were between the agency and its lawyers. *Coastal States*, 617 F.2d at 862–63. The Hardy Declaration recites the legal standard and generally discuss the effects of disclosure on FBI attorneys, but does not make clear the nature of the legal issues for which advice was being sought by the FBI. Hardy Decl. ¶¶ 53-54. Such general statements are inadequate to meet the government's burden. *Wiener*, 943 F.2d at 978.

Furthermore, the Hardy Declaration mentions only one of the two withheld PowerPoint presentations: the one given in September 2011. Hardy Decl. ¶ 54.  The FBI does not establish who the other PowerPoint presentation was presented to, which makes it impossible to determine whether the communication was between privileged persons—a prerequisite for the privilege to apply. *See* FPF-209. To compound the confusion about the FBI's claims, there are redactions made pursuant to the attorney-client privilege that are unsupported by the *Vaughn* index and only

mentioned in the footnotes of the Hardy Declaration (where the withholdings are characterized as "Attorney Work Product"). *See* Hardy Decl. ¶ 53 n.21.

The lack of information about the context of the documents is not the only missing element. The FBI makes no attempt to show how any of the materials were kept confidential, which is a fundamental requirement of the attorney-client privilege. *Mead Data Cent.*, 566 F.2d at 253-54. For example, both partially withheld PowerPoint presentations are marked unclassified, and nothing indicates that they were confidential or privileged. *See* FPF-103 & 209 at Hofmann Decl. Ex. 10. And although some partially redacted emails have a signature suggesting that the message "*may* be confidential and legally privileged," *see, e.g.*, FPF-283 at Hofmann Decl. Ex. 10 (emphasis added), such disclaimers are not dispositive, especially when that disclaimer is added automatically to a message.[16] Without a showing that the information was intended to be confidential and kept confidential, the privilege cannot apply.

The FBI claims attorney-client privilege while reciting the elements of the work product doctrine, and it fails to provide a particularized explanation of the context of specific documents, making it impossible to adequately assess whether the privilege applies at all. The FBI has manifestly not met its burden to invoke the attorney-client privilege. Thus, the government has failed to show that it properly withheld records under Exemption 5.

### 5.   The Government Improperly Withheld Records Under Exemption 7(E)

This Court should also order the government to produce agency records withheld pursuant to Exemption 7(E). This exemption protects from disclosure law enforcement records that would reveal "techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

The threshold issue for a claim of Exemption 7(E) is whether the withheld documents are "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). FPF does

---

[16] *See, e.g.*, *Scott v. Beth Israel Med. Ctr.*, 847 N.Y.S.2d 436, 444 (N.Y. Sup. Ct. 2007) (notice of confidentiality in email footer "cannot create a right of confidentiality out of whole cloth. The notice might be sufficient to protect a privilege if one existed.").

not challenge the designation of withheld records as information "compiled for law enforcement purposes." The government has not, however, met its burden of showing that Exemption 7(E) applies to the records in question.

        **(a)      The Government Has Failed to Describe Material Withheld Under Exemption 7(E) in Sufficient Detail to Carry Its Burden**

The government has failed to provide a particularized explanation of how disclosure of each withheld document would harm the interests protected by Exemption 7(E). *Wiener*, 943 F.2d at 977; *King*, 830 F.2d at 219. For example, the government has entirely withheld eighty-four pages of a policy implementation guide under this exemption. Hardy Decl. ¶ 66; Hardy Decl. Ex. I at 1 (Sub-Category 1.A). The FBI categorically states that this document contains "procedures, techniques, and guidelines" and that the release of this information "could reasonably be expected to risk circumvention of the law"—boilerplate language straight from the FOIA that fails to explain how this particular document meets these standards.[17]

The government also invokes Exemption 7(E) to withhold portions of four pages of the DOJ Media Guidelines. Hardy Decl. ¶ 66; Hardy Decl. Ex. I at 3 (Sub-Category 1.C). Again, the FBI uses stock language from the statute to describe the withheld material as "procedures, techniques, and guidelines" and claims that release of this information "could reasonably be expected to risk circumvention of the law" without providing any particularized justification about how or why this information meets these standards.

The government additionally claims Exemption 7(E) to withhold portions of emails. Hardy Decl. ¶ 66; Hardy Decl. Ex. I at 5-7 (Sub-Category 3.A). As an initial matter, there appear to be discrepancies in the *Vaughn* showing for this category. According to the Hardy Declaration, Exemption 7(E) has been invoked to withhold only ten pages of emails, Hardy Decl. ¶ 66, but the

---

[17] The DOJ characterizes all withholdings under Exemption 7(E) as "techniques, procedures and guidelines," the release of which "could reasonably be expected to risk circumvention of the law." This belt-and-suspenders approach makes it impossible to determine whether the withheld material is "techniques and procedures" or "guidelines . . . if such disclosure could reasonably be expected to risk circumvention of the law." *See Hamdan*, 797 F.3d at 778. Due to the other deficiencies in the DOJ's *Vaughn* showing and the public nature of much of the withheld information, however, the exemption has been improperly invoked regardless of which prong applies.

*Vaughn* index indicates in the "Exemptions" column that Exemption 7(E) has been invoked to withhold fourteen pages.  Hardy Decl. Ex. I at 5-7 (Sub-Category 3.A). To make matters even more confusing, the FBI indicates that it has withheld five pages of a certain document in this category under Exemption 7(E), but the description of the document indicates that only three pages include information for which Exemption 7(E) is claimed. Hardy Decl. Ex. I at 5-6 (explaining withholdings in FPF-282-291). Thus, it is unclear whether the government claims Exemption 7(E) to withhold ten pages, twelve pages, or fourteen pages of emails. Furthermore, the FBI again resorts to boilerplate language to describe the withheld material as "procedures, techniques, and guidelines" and claim that release of this information "could reasonably be expected to risk circumvention of the law" without providing any particularized justification for withholding any of these emails under Exemption 7(E).

As these instances show, the DOJ has failed to describe its withholdings in sufficient detail to carry its burden on Exemption 7(E).

### (b)    The Government Cannot Invoke Exemption 7(E) to Withhold Information that is Routine and Generally Known

The government has improperly claimed Exemption 7(E) "to keep secret an investigative technique that is routine and generally known" to the public. *Rosenfeld*, 57 F.3d 815 (declining to extend Exemption 7(E) to information about law enforcement use of pretextual phone calls as an investigative technique).

The FBI's use of NSLs as an investigative technique is routine and generally known—as are the legal requirements for issuing NSLs. As discussed in II.B, the OIG has painstakingly described the FBI's use (and misuse) of NSLs and exigent letters, and the FBI itself has released an unclassified 2011 version of the DIOG discussing many details of the FBI's NSL procedures. Hofmann Decl. Exs. 11-14; 7 & 15. Not surprisingly, the FBI effectively concedes that it has invoked Exemption 7(E) to withhold "commonly known procedures" in this case. Hardy Decl. ¶ 69 ("While the protection of Exemption 7(E) is generally limited to techniques and procedures, and guidelines not well known to the public, even commonly known procedures may be protected from

disclosure if the disclosure could reduce or nullify the effectiveness of an NSL as for what you CAN/CANNOT do.").

Here are some examples of information withheld under Exemption 7(E) that is publicly known.

*Sub-Category 1.A: Policy Implementation Guide.* The FBI's only particularized explanation for asserting Exemption 7(E) to withhold this entire eighty-four page record is in the *Vaughn* index, where the government claims that releasing this document would reveal "procedures, techniques, and guidelines for conducting cyber investigations"—largely boilerplate language from the FOIA—and "how to articulate the basis for such investigations, as well as how to ensure that such investigations comply with applicable laws, regulations, and FBI and DOJ policies." The legal basis and standards for issuing NSLs are not secret. They are set forth the NSL statutes: 18 U.S.C. § 2709; 15 U.S.C. § 1681v; 15 U.S.C. § 1681u(a) & (b); 12 U.S.C. § 3414(a)(5)(A). How to conduct investigations in accordance with laws, regulations, and public DOJ and FBI policies is likewise generally known.

*Sub-Category 1.B: DIOG.* The government has also withheld thirteen pages in part and nine pages in full related to the DIOG. Hardy Decl. ¶ 66; Ex. I at 2 (Sub-Category 1.B). The information withheld under Exemption 7(E) includes a portion of the definition of an NSL and legal standards for issuing NSLs, despite the fact that these standards are in public laws. FPF-89-90. The withheld information also includes basic run-of-the-mill bureaucratic requirements such as duration of approval to issue an NSL, procedures for creating NSLs, and the need to place a copy of the NSL and related documents in the investigative file. FPF-91-94 at Hofmann Decl. Ex. 10. The FBI has also withheld other specific topics in the document that have been publicly disclosed and discussed by the OIG, as discussed in more detail below in our analysis of the PowerPoint presentations.

*Sub-Category 1.C: Media Guidelines.* The government has claimed Exemption 7(E) to withhold portions of an April 2014 whitepaper concerning then-recent changes to the Media Guidelines. FPF-431-436 at Hofmann Decl. Ex. 10. The redacted information includes "Significant Changes" and summarizes various aspects of the guidelines. FPF-432. This is an improper

withholding: the difference between one version of a public document and another version of the same public document is a matter of public record, as is a summary of information that has been published in the Code of Federal Regulations.

*Sub-Category 2.A: PowerPoint Presentations.* Exemption 7(E) has been asserted to partially withhold eighty-four pages of PowerPoint training presentations about NSLs. Hardy Decl. ¶¶ 69-70; Ex. I at 3-5 (Sub-Category 2.A). The FBI recognizes that material withheld in this category is already generally known to the public. Hardy Decl. ¶ 69. Here are some examples of information withheld under Exemption 7(E) that are public record:[18]

- FPF-125, 210: "NSL Subsystem to [redacted]." The NSL Subsystem is a part of the Foreign Intelligence Surveillance Act Management System (FISAMS). Hofmann Decl. Ex. 14 at viii, 5, 14 & 115. The OIG discussed the FBI's use of this subsystem in detail throughout the 2014 report. *See, e.g.,* Hofmann Decl. Ex. 14 at 17-22 (describing the subsystem and its use in the NSL approval process).

- FPF-108, 216: "NSLs-What you CAN Do [partially redacted]." What investigators "can do" with NSLs is determined by the statutes authorizing the use of this investigative tool in appropriate international terrorism and clandestine intelligence investigations, and is public knowledge. *See* 18 U.S.C. § 2709 (authorizing FBI to issue NSLs to wire and electronic communication service providers to obtain subscriber information, toll billing records information, or electronic communication transactional records in certain international terrorism investigations or clandestine intelligence activities); 15 U.S.C. § 1681v(a) (authorizing FBI to issue NSLs to consumer credit reporting agencies to obtain full consumer reports and "all other information in a consumer's file" in international terrorism investigations); 15 U.S.C. § 1681u(a) & (b) (authorizing FBI to issue NSLs to consumer credit reporting agencies to obtain identifying information about financial institutions and consumers records in certain international terrorism investigations or clandestine intelligence activities); 12 U.S.C. § 3414(a)(5)(A)

---

[18] All Bates-stamped records discussed here are at Hofmann Decl. Ex. 10.

(authorizing FBI to issue NSLs to financial institutions to obtain financial institution and customer-identifying records in certain international terrorism investigations or clandestine intelligence activities). *See also* Hofmann Decl. Ex. 14 at 2-5 (describing the FBI's authority to issue NSLs).

- FPF-109, 211-212: "NSLs-What you CANNOT Do [partially redacted]." Again, the proper scope of NSL use is determined by statute, and the perimeters of that authority is a matter of public record. *See* 18 U.S.C. § 2709; 15 U.S.C. § 1681v; 15 U.S.C. §§ 1681u(a) & (b); 12 U.S.C. § 3414(a)(5)(A).

- FPF-110, 220: "Information sought must be relevant to an [partially redacted]." This is simply the legal standard for issuing an NSL, which is provided in each NSL statute. *See* 18 U.S.C. § 2709; 15 U.S.C. § 1681v; 15 U.S.C. §§ 1681u(a) & (b); 12 U.S.C. § 3414(a)(5)(A). *See also* Hofmann Decl. Ex. 15 at § 18.6.6.3.3 ("Those who approve NSLs . . . must certify that the information sought by the NSL is relevant to an open, predicated national security investigation"); Hofmann Decl. Ex. 14 at 3 ("The ECPA, RFPA, and FCRAu NSL statutes require a certification that the requested records are relevant to or are being sought for an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a U.S. person is not conducted solely on the basis of activities protected by the First Amendment of the U.S. Constitution. The FCRAv NSL statute requires a certification that the information is necessary for the investigation of, or intelligence or counterintelligence activity or analysis related to, international terrorism").

- FPF-113, 225: "What the FBI cannot obtain through an NSL [redacted]." Again, the specific information that the FBI can obtain through an NSL is set forth in each NSL statute. What the government can and cannot obtain though NSLs is public.

- FPF-113: "Will the NSL be served on the appropriate type of recipient? RFPA: [redacted] ECPA: [redacted]." This is not secret information. The RFPA allows the FBI to serve NSLs on financial institutions. 12 U.S.C. § 3414(a)(5)(A). Under ECPA, the

- 30 -

FBI may serve NSLs on wire and electronic communication service providers. 18 U.S.C. § 2709(a). Indeed, in another PowerPoint presentation released through this litigation, the FBI makes clear that various types of NSLs can be issued to internet service providers, telephone companies, financial institutions, and consumer credit reporting agencies. FPF-213.

- FPF-226: "Correct Type of NSL [partially redacted]." Again, the type of NSL that can be served on particular entities to obtain particular types of information is explicit in the NSL statutes and a matter of public record. 18 U.S.C. § 2709; 15 U.S.C. § 1681v; 15 U.S.C. §§ 1681u(a) & (b); 12 U.S.C. § 3414(a)(5)(A). *See also* Hofmann Decl. Ex. 15 at § 18.6.6.3.1 (listing categories of information that can be obtained through each type of NSL authority).

- FPF-115-124, 228-337: These are hypothetical scenarios that help illustrate when the FBI can properly issue NSLs, *e.g.*, only for records that are relevant to an authorized investigation, not in domestic terrorism cases, etc. While presented in the form of hypotheticals, it is basic information about the legal standards for issuing NSLs.

- FPF-120: "May the FBI issue in [sic] NSL for the full credit report of the Chicago-area subject under the Fair Credit Reporting Act § 1681v? [redacted]." The redacted information is once again simply a legal standard: the plain text of 15 U.S.C. § 1681v(a) makes clear that the FBI can issue an NSL to obtain full credit reports in counterintelligence investigations only when they are related to international terrorism. (The prior slide at FPF-119 discloses that the hypothetical investigation is for counterintelligence purposes.)

- FPF-128-129, 245: "What Must the NSL Include? [partially redacted]." Each NSL statute states the requirements for written NSL certifications and approvals by the appropriate FBI officials. 18 U.S.C. § 2709; 15 U.S.C. § 1681v; 15 U.S.C. §§ 1681u(a) & (b); 12 U.S.C. § 3414(a)(5)(A); *see also* Hofmann Decl. Ex. 14 at 3-4.

- FPF-137-139, 256-258: "What is Overproduction [redacted]." The OIG has explained, "[M]any unauthorized collections occur due to errors on the part of NSL recipients when they provide more information than was requested (such as records for a longer period of time or records on additional persons). The FBI sometimes also refers to these matters as 'over collections' or 'overproductions.'" Hofmann Decl. Ex. 11 at 82; *see also* Hofmann Decl. Ex. 14 at 11 n.19.

- FPF-140, 259: "Important to Review NSL Information [redacted]," "You Must Review the Return Information [redacted]." As the 2014 NSL report makes clear, the return information must be reviewed to prevent overcollection and ensure responsiveness. Hofmann Decl. Ex. 14 at 149.[19]

- FPF-141, 260-261: "Common Overproduction Problems [redacted]," "Potential Overproduction Problems [redacted]." The OIG has publicly reported common NSL overproduction problems, such as "recipient provided data in excess of the NLS request," "the NSL recipient furnished records or information not requested in the NSL," and "NSL issued with typographical mistakes in names, addresses, telephone numbers, account numbers, etc." Hofmann Decl. Ex. 12 at 84-85.

- FPF-142, 262: "Common NSL Errors [redacted]," "Potential NSL Errors [redacted]." The OIG has cataloged the FBI's NSL errors in detail. Such publicly reported errors have included issuance of NSLs that lack predication, justification, or documentation of relevance to the investigation; typographical mistakes; issuance of NSLs pursuant to the wrong NSL statute; issuance of NSLs resulting in collection of data outside the scope requested; failure to include the certification required by an NSL statute; issuance of

---

[19] "The special agent in the [Telephonic Communications Analysis Unit] who receives the return information *performs an overcollection review* and sends responsive information to the TCAU Tech Team. The Tech Team prepares the information for uploading into three separate FBI databases and then asks the special agent to verify that the *return information is responsive to the NSL request* and appropriate for uploading into the databases. At that time, the special agent performs a *second overcollection review*. Once the Tech Team receives verification that the special agent did not find any unauthorized information, the team uploads the return information into three separate FBI databases." (Emphasis added.)

NSLs resulting in collection of personal information not relevant to investigation; and issuance of NSLs seeking information not permitted by a particular NSL statute. Hofmann Decl. Ex. 11 at 71 & 80; Hofmann Decl. Ex. 12 at 95, 140-41 & 146-47; Hofmann Decl. Ex. 14 at 10-11, 105-06 & 129 (identifying various documented NSL errors).

- FPF-149, 270: "Telephone Toll Records of Members of Media and News Organizations [partially redacted]." Some information related to the use of NSLs to obtain telephone toll records of members of media and news organizations has been made publicly available by the FBI in DIOG unclassified Annex G. Hofmann Decl. Ex. 7. To the extent this slide contains bureaucratic or administrative requirements to issue NSLs, this is not the type of information that could enable anyone to circumvent the law if publicly known: it is merely an internal approval process.

- FPF-150, 271: "Reporting Requirements [partially redacted]," "Congressional Reporting Requirements [partially redacted]." The NSL statutes require the FBI to report NSL statistics to certain congressional committees on a semi-annual basis, including the number of NSLs issued in investigations relating to U.S. and non-U.S. persons.  18 U.S.C. § 2709(f); 15 U.S.C. §§ 1681u(i); 12 U.S.C. § 3414(a)(5)(C); 15 U.S.C. § 1681v(g). Information about congressional reporting was almost completely unredacted in the 2011 unclassified version of the DIOG and the portion of the DIOG released to FPF through this litigation. *See* Hofmann Decl. Ex. 15 at § 18.6.6.3.8; FPF-96.

- FPF-153, 275: "Full Credit Report-IT Cases [redacted]," "Full Credit Report in CI Cases [redacted]." Again, the redacted information is simply a legal standard: the plain text of 15 U.S.C. § 1681v(a) makes clear that the FBI can issue an NSL to obtain full credit reports only in counterintelligence investigations that are related to international terrorism.

The government has failed to carry its burden on its Exemption 7(E) claims.

### 6.     The Government Has Officially Acknowledged Information Withheld Under All Claimed Exemptions

When information has already been "officially acknowledged," its disclosure may be compelled over an otherwise valid claim of any FOIA exemption. *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990); *Elec. Frontier Found. v. Nat'l Sec. Agency*, No. 14-cv-03010-RS, 2016 WL 1059389, at *2 (N.D. Cal. March 18, 2016). Information is "officially acknowledged" when it is as specific as the information previously released, it matches the information previously released, and it has already have been made public through an official and documented disclosure. *Fitzgibbon,* 911 F.2d at 765.

Substantial portions of section 18 and Annex G of the DIOG have already been publicly released by the FBI in unclassified form. To the extent any information withheld in this case has been made available to the public in the unclassified 2011 version of the DIOG, the DOJ cannot withhold it under *any* FOIA exemption.

### 7.     The Government Has Failed to Segregate Exempt Materials From Non-Exempt Material as the FOIA Requires

Finally, the FOIA explicitly requires that "[a]ny reasonably segregable potion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]"  5 U.S.C. § 552(b); *see also Church of Scientology*, 611 F.2d at 744 ("it is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof.")  The duty to segregate extends to material withheld under any of the FOIA's nine exemptions. *Church of Scientology*, 611 F.2d at 744. To satisfy its burden, the agency must "describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent.*, 566 F.2d at 261; *see also NDRC v. Dep't of Defense*, 388 F. Supp. 2d 1086, 1105 (C.D. Cal. 2005) (finding an agency declaration inadequate on segregability grounds when it stated merely that "none of the withheld documents contain reasonably segregable information that is not exempt.")

Here, the government has not met its burden of showing that it segregated all non-exempt material from exempt information. Indeed, the government did not even enter partially redacted

- 34 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.
CASE NO. 3:15-CV-03503-HSG

documents into the record to allow the Court to review them and make an independent finding about segregability. *Church of Scientology*, 611 F.2d at 744.

The withholding of more than one hundred and fifty pages of drafts in full under the deliberative process privilege alone suggests that the FBI likely has failed to make an adequate effort to segregate non-exempt material from exempt material, as FOIA requires. The Hardy Declaration simply states—with respect to all withheld material—that the FBI has made "all reasonable efforts to ensure that no segregable, non-exempt portions were withheld from the Plaintiff." Hardy Decl. ¶ 24. But an agency must provide a "detailed justification" and not just "conclusory statements" to prove that it has released all reasonably segregable information. *Mead Data*, 566 F.2d at 261.  It is not sufficient for an agency to simply conclude that there is no segregable information without explaining its reasons for that conclusion. *Id.* At the very least, the agency's extensive withholdings in full merit *in camera* review.

## IV.   CONCLUSION

For the foregoing reasons, the government's motion for summary judgment should be denied, and FPF's cross motion for summary judgment should be granted.

DATED: June 10, 2016                     Respectfully submitted,

                                        /s/ *Marcia Hofmann*
                                        Marcia Hofmann
                                        Zeitgeist Law PC
                                        25 Taylor St.
                                        San Francisco, CA 94102

                                        Ahmed Ghappour
                                        200 McAllister St.
                                        San Francisco, CA 94102

                                        Attorneys for Plaintiff
                                        FREEDOM OF THE PRESS FOUNDATION