IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| FREEDOM OF THE PRESS FOUNDATION | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 15-cv-03503 |
| UNITED STATES DEPARTMENT OF JUSTICE | ) ) ) | |
| Defendant. | ) ) ) | |

## SUPPLEMENTAL DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), in Winchester, Virginia.  I have held this position since August 1, 2002.  Prior to joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the United States Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 244 employees who staff a total of ten (10) units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests

for access to FBI records and information pursuant to the FOIA as amended by the OPEN

Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive

Order 13526; Presidential, Attorney General and FBI policies and procedures; judicial decisions;

and other Presidential and Congressional directives.  The statements contained in this declaration

are based upon my personal knowledge, upon information provided to me in my official

capacity, and upon conclusions and determinations reached and made in accordance therewith.

My responsibilities also include the review of FBI information for classification purposes as

mandated by Executive Order ("E.O.") 13526, and the preparation of declarations in support of

Exemption 1 claims under FOIA.[1]  I have been designated by the Attorney General of the United

States as an original classification authority and a declassification authority pursuant to E.O.

13526, §§ 1.3 and 3.1.[2]

> (3)     Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information pursuant to the provisions of the FOIA,

5 U.S.C. § 552 and the Privacy Act ("PA") of 1974, 5 U.S.C. § 552a.  Specifically, I am aware of

the FBI's handling of Plaintiff's FOIA request to the FBI for "records that relate to the

procedures and oversight of National Security Letters (NSLs) or Exigent Letters issued by the

Federal Bureau of Investigation (FBI) to obtain records regarding members of the media."

> (4)     This declaration supplements and incorporates by reference my previous

declaration of May 9, 2016 ("First Hardy Declaration") and further addresses Plaintiff's

challenges.

> (5)     In an effort to provide Plaintiffs with the utmost level of transparency in regard to

the FBI's Domestic Investigations and Operations Guide ("DIOG"), processing of the responsive

---

[1] 5 U.S.C. § 552 (b)(1).

[2] I was likewise designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to E.O. 12958, as amended, §§ 1.3 and 3.1.

2

pages was conducted by making an item by item analysis against the most current, redacted version of the FBI's DIOG publicly available on the FBI's Vault at https://vault.fbi.gov/, in order to ensure that the material redacted in this case was not publicly disclosed in the DIOG. In addition, careful analysis was applied in instances where information within the processed records was so intertwined with publicly released information that it was not possible to segregate out the public information.

## SCOPE OF AND SEARCH FOR
## RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(6)    As indicated in ¶19 of my First Hardy Declaration, RIDS prepared and circulated Electronic Communication ("EC")[3] dated September 9, 2015 to the Discovery Processing Unit ("DPU"). In response to the search EC, DPU contacted the FBI Office of the General Counsel ("OGC") as that division was deemed reasonably likely to possess responsive records, or otherwise with knowledge about where responsive records would reside. DPU contacted all three branches of OGC: 1.) the National Security Law Branch, 2.) the Litigation Branch, and 3.) the Investigative and Administrative Law Branch. Each branch, in turn, reached out to all the units within their respective branch and tasked them with searching for responsive records as detailed in the search EC. The FBI provides the following additional information concerning these Branches and their units:

> 1.) National Security Law Branch ("NSLB") provides legal services in support of the Directorate of Intelligence and the Counterterrorism, Counterintelligence, and Cyber Divisions. In addition, NSLB ensures efficient, timely process to initiate and renew warrants issued under the Foreign Intelligence Surveillance Act ("FISA"). NSLB is responsible for supplying critical, time-sensitive legal advice when intelligence or national security information is disseminated to, requested by, or otherwise used in the context of either a criminal

---

[3] Specifically, RIDS requested copies of all records held by the FBI pertaining to the procedures and oversight of NSLs or Exigent Letters issued by the FBI to obtain records regarding members of the media and to include any records located which were created on or before August 10, 2015, the day on which RIDS initiated the search. RIDS attached a copy of Plaintiff's FOIA request letter to the EC.

investigation or prosecution, civil litigation or analytical projects, or dissemination to a foreign power. NSLB provides legal training to counterterrorism and counterintelligence operational units, field offices, senior FBI officials, FBI attorneys, and to agents and analysts generally. The Branch participates in Intelligence Community policy formulation and advises on pending legislation affecting FBI intelligence operations. This branch consists of the following units.

- Three CounterTerrorism Operations Units
- Classified Litigation Support Unit
- Foreign Intelligence Surveillance Act Unit;
- Cyber Law Unit;
- National Security Law Policy & Legislative Review Unit;
- National Security Law Compliance, Oversight, & Training Unit;
- Counterintelligence Law Unit; and
- Terrorist Screening Center

2.) Litigation Branch coordinates the defense of all civil actions filed against the United States, the FBI and individual FBI employees on the basis of alleged actions of the FBI and its employees. This branch consists of the following units:

- Freedom of Information Act Litigation Unit;
- Two Civil Litigation Units;
- Two Employment Law Units;
- Discovery Coordination and Policy Unit; and
- Two Discovery Processing Units.

3.) Investigative and Administrative Law Branch assists the General Counsel in supporting the operational and administrative components of the FBI by providing timely, accurate, and cogent legal advice and counsel on a wide range of issues and matters in the administrative and investigative law field. This branch consists of the following sections and corresponding units:

- Science and Tehnology Section
  - Operational Technology Law Unit;
  - Laboratory Law Unit;
  - Criminal Justice Information Law Unit;
- Investigative Law and Training Section
  - Legal Instruction Unit;
  - Investigative Law Unit;
  - Legal Forfeiture Unit;

As a result of its search efforts, these offices identified responsive material which it provided

RIDS for FOIA processing.

(7)    In addition to an EC to the offices within the FBI most likely to have responsive records, RIDS also conducted a review of the DIOG to locate any responsive sections of the DIOG likely to pertain to NSLs. The DIOG contains descriptions of substantially all of the FBI's procedures, techniques, and strategies for conducting investigations, basically the FBI's law enforcement and national security "playbook". Therefore, the DIOG is a logical location for responsive information concerning NSLs. Upon this review of the DIOG, RIDS identified section 18 as potentially responsive. Section 18 of the DIOG pertains to the Investigative Method: National Security Letter (Compulsory Process).[4]

Contrary to Plaintiff's suggestion that the FBI's search for responsive records did not cover the full time period specified in Plaintiff's request, the search EC directed that the search encompass all documents created on or before August 10, 2015.

## EXEMPTION 5 – PRIVILEGED INFORMATION

---

[4] To clarify my statement at ¶ 21 of my First declaration, the updated DIOG Classified Appendix – Section G-12 was not identified in the review of the DIOG because the Classified Appendix, while referenced, is not included in the unclassified version reviewed. The title listed in the Appendices is **Appendix G: Classified Provisions** and the title itself contains no information indicating its connection to NSLs that would prompt the reviewer to seek out the Appendix for further review. However, a draft version was located as a result of the search EC. It is an attachment to an e-mail dated February 25, 2015 (Bates pages FPF-292-293) and is not the final version. This draft is referenced in Sub-Category 1.B. DIOG of the Vaughn Index consisting of the following Bates pages: FPF-294-295, 299-300, and 301-302. The same exempt information withheld in the final version on the vault is withheld in the draft pages per exemptions (b)(1) and (b)(7)(E). The draft is not the final version and differs significantly from the final version on the Vault. Due to its deliberative nature, the entire draft is also withheld in full pursuant to FOIA Exemption (b)(5). The FBI's practice is to now add Exemption (b)(3) to classified information concerning sources and methods. Therefore, for the current draft version, (b)(3) was also applied to certain information on the withheld in full draft pages. In summary, the following bates pages are withheld per exemption (b)(1), in addition to, exemptions (b)(3), (b)(5), and (b)(7)(E): FPF-294-295, 297-299, and 301-302. The FBI will provide an in camera declaration and/or offer the documents for in camera review if the court requests additional detail concerning the classified information withheld. The only additional information that the FBI can provide publicly concerning the withheld information in Appendix G is that it discusses classified sources and methods and acts as a classified supplement to the unclassified provisions of the AGG-Dom and DIOG. Much of the classified portions relate directly to implementation of guidance provided in the AGG-Dom, Classified Provisions. The unclassified portions of Annex G relate to sensitive techniques, procedures, and guidelines. The specific implementation of these aspects of the guidance, within the FBI and under certain identifiable contexts, is not public knowledge.

(8)     As discussed in my First Hardy declaration at ¶¶ 51-55, Exemption 5 allows the

FBI to protect information contained in "inter-agency or intra-agency memorandums or letters

which would not be available by law to a party other than an agency in litigation with the

agency." In this case, the FBI protected information pursuant to the deliberative process

privilege and the attorney-client privilege.

Deliberative Process Privilege - 1

(9)     As explained in the First Hardy Declaration ¶ 55, the FBI protected deliberative

process material in the following types of documents: the Cyber Policy Implementation Guide,

internal FBI policy emails, the draft DIOG appendix and the red-lined draft of the Media

Guidelines, mentioned at FPF-324. The red-lined draft of the Media Guidelines (Bates pages

FPF-326-344 and FPF 351-393) were withheld in full as deliberative per OIP.[5] The documents

warrant protection under the deliberative process privilege, because they are attachments to inter

and intra agency e-mails exchanged between personnel responsible for making policy decisions

and contain predecisional policy recommendations. The pre-decisional nature of these items is

evidenced by information released within the e-mails and preceeding the documents that are

subject to revision. For example, FPF-282 states "The only comment I have is regarding the

phrase..." FPF-284 contains language indicating that "proposals" are attached for updates. FPF-

285 clearly indicates a give and take discussion concerning revisions to an attachment (Classified

Annex G) by stating, "Per our discussion, attached is the revision to....". FPF-287 includes

langauge indicating that advice is being provided, "so that they know the advice you are giving

out on this issue." FPF-290 contains text in an e-mail from lower level FBI personnel seeking

advice of FBI counsel as indicated by the words, "I have a question that I'm hoping you can

answer or refer me to the person who can...". FPF-305, "I made some extremely minor

---

[5] See First Hardy declaration at ¶31 for information concerning the OIP consultation.

comments (and found a typo) in the document." These are just a few of the examples consistent with the context in which the rest of the withholdings are made.

(10)    These type of statements provide a clear indication that the withheld information exempts from release recommendations, analyses, speculation and other non-factual information prepared or received by these policy decision makers in anticipation of agency decision-making. For the reasons identified at ¶ 55 of my First declaration, this information should be withheld. The released information within the e-mails supply the necessary context showing that the withheld information is not the final decision in any of these areas as all documents are referenced as drafts, red-line versions, suggestions and/or proposals. The FBI properly withheld this information pursuant to (b)(5).

Attorney Client Privilege - 2

(11)    As described in my First declaration at ¶¶ 56-58, the Attorney Client Privilege is asserted to protect confidential intra agency communications between clients seeking legal advice from a professional legal adviser in his/her capacity as a lawyer.[6] Such communications are permanently protected from disclosure by the legal adviser unless the client waives the protection. This withheld information contains confidential communications made to and from attorneys by decision-making personnel as well as lower echelon employees who possess information relevant to an attorney's advice-rendering function. [7]

(12)    The FBI protected confidential communications between and among FBI counsel and their FBI client employees reflecting the seeking and/or providing of legal advice with

---

[6] My First Declaration inadvertently referenced these as attorney work product, instead the FBI is asserting attorney-client privilege over these pages.

[7] Exemption (b)(5) Attorney Client Privilege asserted on the following Bates pages: FPF-108-111, 120, 123, 134, 142, 150, 153, 211, 216-218, 223, 233, 236, 252, 262, 271, 275-276, 283, 292, and 405. My First Declaration , at times, inadvertently referenced attorney work product doctrine; instead the FBI is asserting attorney-client privilege over these withholdings.

respect to NSLs (the same information is also covered by the deliberative process privilege).

Additionally, the FBI asserted the attorney client privilege to protect legal advice provided by

OGC counsel in the form of training slides.  This is evidenced by the fact that OGC counsel is

involved in the discussions taking place within the e-mails and is providing advice to employees

via a PowerPoint Presentation.  The withheld information in PowerPoint presentations at FPF-

108-111, 120, 123, 134, 142, 150, 153, 211, 216-218, 223, 233, 236, 252, 262, 271, 275-276

describe issues and scenarios from which counsel's advice flows to employees.  Contrary to

Plaintiff's suggestion in their brief, my previous Declaration referenced both PowerPoint

presentations as covered (though the footnote inadvertently referenced the attorney work product

doctrine) (*see ¶52* n. 21 of that Declaration).  The attorney-client privilege withholdings in both

PowerPoint presentations reflected confidential communications from OGC counsel to agency

employees concerning legal issues.  The information withheld in e-mails also reflects instances

of counsel providing legal advice with respect to NSLs (the same information is also covered by

the deliberate process privilege).  For example, FPF-283 is authored by an Assistant General

Counsel in the National Security Law Branch.  Operational personnel and other employees look

to the National Security Law Branch attorneys for guidance and interpretation of various

authorities as applied to specific cases and scenarios they encounter daily.  The redacted portions

of the PowerPoints and e-mails are advisory in nature and reflect specific legal advice to FBI

clients related to the FBI's use of NSLs as an investigative technique or procedure.  The nature

of the training and the audience for these e-mails is internal and not publicly disclosed; therefore,

they are confidential.  Given that the FBI has not released the advice publicly, and because any

publicly available information is intertwined with the interpretation and application of the public

information in the form of legal advice and therefore not segregable, it is clear that the client

(FBI employees) has not waived the privilege. Accordingly, the FBI properly withheld this information pursuant to the Attorney Client privilege.

## EXEMPTION 7(E) – INVESTIGATIVE TECHNIQUES AND PROCEDURES

Operational Directives Concerning Sensitive Investigative Techniques and Strategies -1

(13)    The First Hardy Declaration at ¶ 66 provides the rational for withholding information and Operational Directives Concerning Sensitive Investigative Techniques and Strategies. Additionally, although some of the withheld information on these pages summarize publicly known information, this information is intertwined with the non-public information and the FBI's analysis. Further, to reveal even public information within these pages would provide potential criminals with a window into the FBI's strategies in that it would disclose legal requirements and other issues relating to NSLs that the FBI believes are important enough to stress to its agents.

(14)    While the FBI again reiterates the caution it must use in providing additional detail while not revealing the very information it seeks to protect, the FBI will attempt – within those limits – to further elaborate its rationale for withholding in response to specific examples outlined in Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment.

(15)    In addition to the reasons described in my First Hardy declaration at ¶66, the FBI provides the following additional details concerning the documents located in Sub-Categories 1.A (Policy Implementation Guide)[8], 1.B (DIOG), 1.C (Media Guidelines), and 2.A (PowerPoint Presentations) and withheld as Operational Directives Concerning Sensitive Investigative Techniques and Strategies (-1).

---

[8] The draft Cyber Division Policy Implementation Guide was reviewed and withheld at FPF-4 through FPF-87. Upon a secondary review, the FBI has determined that only  FPF-64-65, 74-75, and  FPF-84 are responsive. The remainder of the guide (FPF 1-4, 5-63, 66-83, and 85-87) is not responsive to the request.

(16)   <u>Operational Directives</u>: The documents represent implementation of specific applicable laws, regulations, and FBI and DOJ policies and strategies utilized by the FBI within its investigations as it applies those laws, regulations, DOJ policies and procedures.  Although the primary sources (i.e., statutes, regulations, some policies or procedures) may be publicly known – the specific details concerning the FBI's implementation and analysis of these authorities are not.  The documents and information withheld within these categories represent not only the "why" of the FBI's actions, but rather the "who," "how," and "when" in conjunction with FBI specific circumstances and not in a broad context as is outlined in the primary source documents from which the implementation is created.  Disclosure would reveal the very strategies the FBI employs in specific types of investigative matters.  Releasing this exempt information would allow entities and individuals seeking to commit crimes or threaten the United States' national security an opportunity to assess the entirety of the FBI's law enforcement and domestic intelligence strategies.  Access to such detailed information would greatly increase the risk that potential lawbreakers would be able to evade detection and/or be emboldened to engage in criminal activities.

(17)   In addition to the discussions above, some of the documents and information withheld (such as the examples in fn 9) include descriptions of very specific methods that the FBI uses to collect and analyze the information that it obtains through NSLs for investigative purposes.  Since 9/11 and especially after the enactment of the Intelligence Reform and Terrorist Prevention Act of 2004 (IRTPA), the FBI has been transforming itself into an intelligence-driven agency to aid its paramount mission of detecting and preventing harm to the national security before it happens.  Two essential components of this effort-indeed the sine qua non of this mission – are the collection and analysis of information.  The FBI has fully described this

mandate under IRTPA to the American Public—but it has not disclosed the precise methods by which it will be carried out. The release of this information would disclose methods used in the collection and analysis of information. Such disclosures would enable subjects of FBI investigations to circumvent similar, currently used techniques. The relative utility of these techniques could be diminished if the actual techniques and the specific circumstances (FBI strategy) under which they are employed were released. This, in turn, would facilitate the accumulation of information by investigative subjects regarding the very circumstances under which the technique can be used or requested and the usefulness of the information obtained. To release this type of information would enable criminals, terrorists and spies to educate themselves about the techniques employed for the collection and analysis of information. That information would improve the ability of such individuals to take countermeasures to circumvent the effectiveness of the techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities.[9]

(18)   Other Information withheld under Exemption 7(E) includes specific filing numbers and non-public file classifications, filing procedures, unit coordination references, and specific information required on forms and determined to be operationally useful enough for placement in non-public databases. Examples of this information are contained in the withheld draft Cyber Division Policy Implementation Guide. If released, this information could be of great interest to individuals and entities seeking to engage in espionage against the United States by

---

[9] The PowerPoint slides teach analysis by identifying the Operational Directive and applying an aspect of that authority to unique circumstances of an FBI investigation, or as applied to certain complex situations. The slides, through critical thinking and analysis of real world situations FBI employees will encounter – if released in full would disclose to the public (including would-be criminals) the various strategies the FBI employs in its investigations. For example, at FPF-220 the slide discusses what the "legal standard" for "relevance" means to the FBI. The criteria for relevancy is supplied then applied in the example that follows it at FPF-222. This allows the audience to interpret the standard as it applies in FBI Investigative matters. The PowerPoint presentations follow this format throughout. If a criminal had advance knowledge of FBI investigative strategy (analysis and collection, specifically, as applied in certain identifiable circumstances), the criminal is more able to avoid scrutiny and detection by the FBI in order to circumvent the law.

obtaining secret information about national security and terrorism matters.  An entity seeking to locate information to illegally exploit it would be greatly aided in its efforts by the detailed descriptions, guidance, hypothetical applications and scenarios, criteria and triggers withheld within these documents.  If released, this information would identify the types of information needed to authorize particular investigative techniques – beyond any information that is publicly available.  Release of such information could assist a potential criminal by identifying information to obscure or hide in order to "cover one's tracks" and avoid detection[10]

      (19)    Other information withheld identifies individual offices or officers to whom certain information must be reported.  Examples of this withheld information appears throughout the draft Cyber Division Policy Implementation Guide and under approval requirements found within the draft classified DIOG Appendix G.  As with identifying forms and the databases that contain specific information, identifying who (and at what level), specifically, has this level of knowledge about certain types of investigatory information makes those individuals targets for intelligence operatives.  As a result of knowing who has access to certain information and the ability to approve or deny certain requests within investigative matters, individuals could gain insight into, and seek to sway, infiltrate, or otherwise undermine FBI operations and activities, and gain insight through actions such as social engineering (i.e., attempts at manipulation for the purpose of gaining unauthorized access to confidential information) to allow them to circumvent the law.

---

[10] The FOIA process provides the public with a large amount of data from its investigations and through release is subject to "data mining".  Hostile entities can methodically extract bits and pieces of information from the releases and analyze that data to determine the placement of FBI resources through patterns.  For example, if a large number of files of the classification 123 are withheld pursuant to FOIA Exemption b7A in a particular jurisdiction – a hostile analyst might determine that the jurisdiction is placing a high amount of attention to investigations of that particular classification.  By contrast, the lack of any file classifications 456 or 789 being released into the public could provide insight into the jurisdiction as being a good location for that type of crime to go undetected since the resources are not focused in that area.

(20)     The withheld information and documents also contain a number of hypothetical examples that illustrate when particular activities or particular investigative techniques – including the use of NSLs – are utilized.  Disclosure of such information presents an increased risk of potential circumvention.  If an individual were considering engaging in illegal activity, knowledge of specific activities that would or would not trigger authority to use particular investigative activities or techniques, would improve his or her ability to alter behavior to avoid detection.  In addition, knowing that a particular activity would not trigger authority for a particular investigative activity or technique may embolden a potential lawbreaker to proceed with his or her plans.[11]

(21)     The information and documents withheld identify certain sensitive investigative matters for which additional notifications and authorizations are required.  Examples of this appear throughout the draft Cyber Division Policy Implementation Guide and under the approval requirements contained in the draft DIOG Appendix G.  In assessing whether or not to engage in criminal activity, some criminals may weigh the risk of detection against the rewards for engaging in the behavior.  Knowing that some matters are considered sensitive by the FBI may lead an individual to conclude that, because the investigative technique or activity necessary to detect the activity is administratively more burdensome for the FBI to conduct, the FBI is less likely to actually conduct the investigation.  A person reaching this conclusion may be more likely to engage in the prohibited activity.[12]

(22)     The FBI has withheld certain terms and definitions within the documents.  One example appears at Appendix D (FPF-70-80, withheld in full) to the draft Cyber Division

---

[11] FPF-115-124, 228-237 contains withheld information fitting this description.
[12] By way of example, hypothetically if a higher level of approval were needed for the employment of a certain investigative technique were needed to obtain records of a tax accountant than are needed for obtaining the records of a financial consultant – a criminal would be more likely to apply that knowledge by conducting his activities under the guise of the accountant than a consultant – decreasing the likelihood of detection.

Implementation Guide, which provides a list of key terms with definitions tailored to the context that Cyber Division and the FBI utilize the information in investigations.  Understanding the specific context to which a specific term or definition applies, particularly within a specific Guide, DIOG, or within Media Guidelines, and training materials would identify targets of heightened scrutiny – merely by their placement in a glossary or index to the document, or contained within a description on training materials.  Further defining and providing the scope of individuals classified into specific categories for investigative purposes – as opposed to a general mention – provides an individual seeking to avoid detection information as to what category or role they should fit themselves into.  By doing so, the organization/operative can wrap themselves into a cloak of activities given preferred status by law and essentially challenge the FBI to investigate knowing that any investigative activity would be subject to much higher internal and external examination than would another category.  It must be emphasized that unlike the definitions released in public versions of documents – the withheld definitions are specific to the FBI and are not necessarily a definition that would be intuitively obvious from the public's perspective.[13]

(23)     The FBI has also withheld documents and information constituting collections of definitions of specific categories of investigative activities, are excerpts from specific grouped descriptions, or provide further interpretation and/or analysis of investigative activities. Disclosure of this information could increase the risk of circumvention of FBI investigative techniques or of substantive law.  A person either considering committing a crime or attempting to evade detection, knowing that certain types of investigative activities are or are not prohibited

---

[13] FPF-84 provides a list of acronyms used throughout the guide. While the acronym of NSL for National Security Letters, alone, does not qualify as exempt information, its inclusion in the larger context of the list containing  other acronyms relevant to the Cyber Division Policy Implementation Guide is exempt.  Release of certain non-public tools referenced in the list – in conjunction with Cyber Division – could provide insight to potential adversaries as to certain Cyber Division strategies utilized in investigations.

during specific types of investigations, can combine this knowledge with other publicly available information to determine whether his or her activities are likely to be detected. Similarly, knowledge that a particular activity will not be approved absent certain factors could be exploited by someone seeking to evade detection.[14]

(24)     The FBI has also withheld documents and information that include descriptions of technical or practical limitations in investigative techniques employed by the FBI. Many techniques have practical limitations (for example, those imposed by the limits of cooperation with other entities) or technical limitations (for example, types of data that can or cannot be retrieved). These limitations are not generally known but would obviously be of genuine interest to anyone seeking to evade the FBI's efforts to enforce the law.[15]

(25)     Certain redactions within the production also describe the temporal limitations imposed on the use of various investigative techniques. While these internal guidelines are of no interest to the general public, they are of potential interest to persons seeking to evade detection of prosecution for criminal activity. A person who learns that a particular technique has been used in an investigation would be able to combine that information with details from these records to ascertain how long to delay engaging in a criminal activity in order to increase the likelihood that he or she will avoid detection.[16]

(26)     Contrary to Plaintiff's assertion that the FBI is withholding, "basic run-of-the-mill bureaucratic requirements such as duration of approval to issue and NSL, procedures for creating

---

[14] For example, FPF-89 contains a redaction block mid-page that follows the words, "However, the authority to approve NSLs may be designated to an acting official (see below)." The redacted paragraph, if disclosed, would reveal additional internal details about the designation of authority, documentation requirements, and specific internal records where the information is to be kept. In this instance, the publicly available information was released. The additional details that are not publicly known and could result in the harms described, were withheld.

[15] By way of example, FPF-88 contains within the first and second redaction block (beneath the heading "Overview of Compulsory Process" withheld details related to certain internal limitations on the use of NSLs. The non-public information is intertwined with the public information in such a manner that no further segregation is possible.

[16] An example of this appears on FPF-91 beneath the heading, "Duration of Approval" at mid-page. The withheld information describes when the NSL authority remains valid.

NSLs, and the need to place a copy of the NSL and related documents in the investigative file"
the withheld information is far more complex than implied in this statement. As noted above, the
withheld information includes many more factors intertwined with the basic information. It is
that level of detail, known only internally within the FBI that the FBI seeks to withhold.
Plaintiff's assertions relate to the context in which the redaction blocks appear, but do not clearly
identify the exact information beneath the redaction. (Plaintiff's Opposition, pg. 28, lines 16-
24). Likewise, as Plaintiff correctly points out – the legal basis and standards for issuing NSLs
are not secret but are set forth in the NSL statute. The FBI would like to point out that it released
the applicable statutes and authorities at FPF-88 under section 18.6.6.3.1 of the DIOG. This is
not the same information the FBI is withholding elsewhere in the documents. The FBI has not
withheld any portion of the definition at FPF-89, but rather it has withheld certain limitations,
internal to the FBI, mentioned after the definition. The specific procedures for creating NSLs at
FPF 91-94 are not mere recitations of the statute or other public authority. The withheld
procedural information relates to specific internal procedures, non-public approval levels,
limitations in specific circumstances, identification and contents of file numbers (including file
classifications), identifying symbols, forms, and databases, all of which is not included in the
public authorities and represents either internal information with the potential to allow for
circumvention if disclosed, or information that is so intertwined with the internal information
that segregation is not possible.

(27)     Plaintiff's assertion on page 28, lines 25-28 in his Opposition concern information
withheld for similar reasons as noted above. Plaintiff alleges that the withheld information
merely summarizes publicly available information and authorities. This is not the case. The FBI
has withheld information within these sections containing publicly known information that is so

intertwined with the FBI's analysis, that segregation is not possible. The analysis is internal to the FBI and is basically an interpretation and analysis of how those changes pertain to the internal, non-public procedures. Contrary to plaintiff's assertion, the withheld information is not merely a summary of the differences between one <u>public</u> document and another version of the same <u>public</u> document, it is an analysis of those differences and how they impact FBI operations.

(28)   The following will address Plaintiff's inquiries concerning specific documents in Sub-Category 2.A (PowerPoint Presentations):

- FPF-125, 210:  Plaintiff asserts that the withheld information concerns a publicly known NSL Subsystem that is part of the Foreign Intelligence Surveillance Act Management System (FISAMS). The FBI will not confirm or deny if Plaintiff's guess is correct; however, the FBI states that even if the information pertained to a system that was publicly acknowledged – the purpose of these slide presentations are to provide training and legal advice from the Office of General Counsel to employees. Such training would include internal procedures and systems, the manner of use is not known to the public in the context of the information presented in the slides.

- FPF-108, 216:  Contrary to Plaintiff's assertion that the withheld information only recites the same publicly available information on the topic, the withheld information actually interprets and applies guidance concerning the scope, duration, and subjects for which FBI employees should utilize NSLs in the context of FBI investigative matters. The information is to be an analytical tool for the FBI employees when applying the statutory authorities to FBI investigative matters. That analytical "link" is so intertwined with non-segregable,

publicly available information that any disclosure would reveal the FBI's strategies as well as its limitations.

- FPF-109, 211-212, 110, 220, 113, 225-226:  The information withheld on these pages includes the FBI's interpretation and analysis of publicly available authorities and is used to articulate specific internal FBI procedures and case strategies.  Although some of the withheld material on these pages summarizes publicly known information, this information is intertwined with the non-public information and analysis.  In addition, to reveal even public information within these pages would provide potential criminals with a window into the FBI's strategies in that it would disclose legal requirements and other issues relating to NSLs that the FBI believes are important enough to stress to its field employees.  Disclosure of such information would naturally tend to pose an increased risk for circumvention of the law.

- FPF-115-124, 228-237[17]:  Plaintiff contends that the withheld information on these pages represent basic information about the legal standards for issuing NSLs; however, this is only partially correct.  The basis for withholding hypothetical scenarios is provided at ¶ 21, *supra*.  While the basic authorities are public, these pages consist of the FBI's analysis of specific hypothetical scenarios.  The specific types of circumstances encountered by the FBI, the analysis of those circumstances in relation to the authorities, and resulting interpretation are not public and disclosure would reveal FBI strategies in specific types of cases.

---

[17] It appears that there may have been a typographical error in Plaintiff's Opposition. FPF-115-124, 228-237 relate to hypothetical scenarios.  It does not extend to FPF-337.

- FPF-128-129, 245:  Plaintiff asserts that the withheld information is merely a recitation of the requirements for written NSL certifications and approvals by the appropriate FBI officials; however, the withholdings would disclose specific internal procedures and guidelines not specifically provided for in the publicly available authority.  Although underlying requirements pertaining to NSLs may be publicly known, these pages consist of an interpretation and an analysis and not a recitation of only the publicly available information.  Any publicly known information noted in the withholding is so intertwined with the non-public information that segregation is not possible.  Disclosure would allow for circumvention by providing potential criminals with an analysis of the "hoops" that must be jumped in order for an NSL to be approved internally- as well as under the publicly available statutory requirements. Failure to meet any of these internal requirements could allow a potential criminal to go undetected.

- 137-139, 140, 256-259:  Plaintiff asserts that the description of "overproduction" alleged to be contained within the redaction blocks of these slides has been made publicly available in a similar form.  Although the concept of overproduction has been publicly disclosed, the purpose of these pages is to provide an interpretation and analysis of overproduction in the context of FBI investigative matters. Certain of these pages also contain hypothetical examples illustrating how FBI employees should analyze whether overproduction has occurred and what they should do in response.  To the extent some of the withheld material on these pages summarizes publicly known information, the information is intertwined with the FBI's non-public analysis, guidance, and answers to hypothetical scenarios.  It is

designed to be an analytical tool for FBI employees to recognize overproduction within their cases and to take the proper internal steps concerning any overproduction issues. Release of this information could lead to circumvention because failure to adhere to the FBI's internal requirements could allow a potential criminal to go undetected through a denial of approval authority.

- FPF-140, 150, 259, 271: Similar to previously described rationale, release of the FBI's specific internal steps for compliance with Statutory Reporting requirements could provide potential criminals with the necessary insight to affect the process (including the triggers) by a better understanding of the likelihood of detection. (See ¶¶ 24, 26.)

- FPF-141-142, 260-262: While Plaintiff is correct that the OIG has publicly reported common NSL overproduction problems and errors, the list at 141, 260-261 focuses on those overproduction problems the FBI deems most relevant. Disclosure of this information could reveal vulnerabilities in the FBI's processes that a potential adversary could take advantage of to circumvent the law.

- FPF 149, 270: Plaintiff asserts the withheld information on these pages represents "bureaucratic or administrative requirements to issue NSLs to obtain telephone toll records of members of media and news organizations" and that it "has been made publicly available by the FBI in DIOG unclassified Annex G." As discussed in ¶¶ 24, 26-27, *supra*, while administrative requirements might appear to be mundane to a potential criminal, this knowledge creates a vast array of insight into the likelihood of further investigation or detection of their activities. Release of this information, when combined with other available information,

when analyzed as a whole and not in a vacuum, could result in circumvention of the law.

- FPF-153, 275:  Plaintiff believes the redacted information merely recites the plain text of 15 U.S.C. § 1681v(a); however, the redacted information instead places emphasis on specific portions of the language and interpretation of the text.  Only specifically selected portions of the text are quoted.  The remaining withheld information is interpretation and analysis as deemed relevant by the FBI to its investigative strategies.  Due to the intertwined nature of the emphasized information to the plain text of the statute, segregation is not possible without revealing the FBI's focus in its analysis.

### CLARIFICATION AND CORRECTION TO THE VAUGHN INDEX AND DECLARATION

(29)     The following corrects portions of the Vaughn Index, Sub-Category 3.A – Emails.

- Bates pages <u>FPF-282-291</u> – Total Pages block should be 10 pages not 12 pages and Disposition block should be 8 pages RIP not 10 pages RIP.
- Bates pages <u>FPF-394-406</u> – Description block should start with seven pages not eight pages.

(30)     The following clarifies the First Hardy Declaration ¶ 29 (Category 3.A. – Emails) – The email category contains fifty-seven responsive pages consisting of emails.  Of the fifty-seven pages of emails, thirteen pages of emails were withheld (b)(7)(E) see chart below.  Only ten pages of emails were withheld per (b)(7)(E)-1 which matches Hardy Declaration ¶ 66 (Operational Directives Concerning Sensitive Investigative Techniques and Strategies-1).

See First Hardy Declaration for a breakdown of the following categories:

Operational Directives Concerning Sensitive Investigative Techniques and Strategies -1 (¶ 66)
Investigative Focus of Specific Investigation- 2 (¶ 67)
Internal FBI Secure Fax Number, Email or IP Address, Intranet/Web Address-3 (¶ 68)
Investigative Techniques and Procedures-4 (¶ 69)

|     | (b)(7)(E)-1 | (b)(7)(E)-2 | (b)(7)(E)-3 | (b)(7)(E)-4 |
| --- | --- | --- | --- | --- |
| 287 |   |   | x |   |
| 288 | x |   |   |   |
| 289 | x |   | x |   |
| 290 | x | x | x |   |
| 292 |   |   |   | x |
| 394 | x |   |   |   |
| 395 | x |   |   |   |
| 397 | x |   |   |   |
| 398 | x |   |   |   |
| 399 | x |   |   |   |
| 400 |   |   | x |   |
| 401 | x |   |   |   |
| 402 | x |   |   |   |

(31)     The total pages of emails do not match total pages in the index.  Since Plaintiff is not challenging all exemptions (i.e.. (b)(6) and (b)(7)(C)), pages containing exemptions not being challenged are not included in the index.  For example, Bates pages FPF-403-404 are emails containing only exemptions (b)(6) and (b)(7)(C); therefore, they are not included in the Index.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _15th_ day of July, 2016.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia